OPINION OF THE COURT
Edward J. Greenfield, J.
The complex and varied relationships between men and women, when they come to an end, oft leave a bitter residue and a smoldering irritation for which the salve, often the only soothing balm, is cash. It is a poor substitute for love, affection or attention, but for many its satisfactions are longer lasting. “Ordinarily, alimony is the end product of the fission of matrimony by acrimony.” (Elkin v Ehrens, 43 Misc 2d 493.) More recently, the termination of informal “live-in” relationships has given rise to claims for “palimony”. Now, in this case, a man who claims to have been the constant companion of an elderly wealthy widow, who changed his life style from genteel poverty to luxury at her behest, sues at the breakup of their relationship for what may be called, for want of a better term, “eompaniomony”.
*202 Plaintiff is a 67-year-old gentleman, who was earning a modest but respectable living as a travel tour operator, when a person on one of his tours, the defendant, Mrs. Catherine Bryer Van Bomel, a wealthy widow with assets stated to be in excess of $40,000,000, began making demands on his time, and allegedly agreed to support him in luxurious fashion, if he would devote all his time and attention to her. He gave up his business career, in which he admits he was earning no more than $8,900 a year and became the ever-present companion of Mrs. Von Bomel. He moved to larger quarters and modified his wardrobe to suit her tastes. He accompanied her to lunch and dinner, escorted her to the theatre and parties, and traveled with her on her trips to Europe. All this was at the lady’s expense, of course. He also acted as her confidante and her friends’ became his friends.
For five years his life was constantly dominated by the needs, whims and desires of Mrs. Van Bomel. She spent money lavishly on him. Apart from taking care of his rent and his travel expenses, she had his suits hand tailored in Italy and in London, presented him with two Pontiacs and a Jaguar and gave him a monthly stipend. All'in all, she expended well over $300,000 for his personal needs. Then, suddenly, it all came to an end. Accustomed to a life of luxury, and now without the means to attain it, plaintiff sues his former benefactress for $1,500,000.
In the first cause of action, plaintiff seeks recovery on an alleged express oral agreement, pursuant to which he agreed to give up his business and render services to the defendant, in return for which defendant would pay and provide (a) all his costs and expenses incurred in connection with the performance of his services, (b) all his costs and expenses for sumptuous living during the time the services were rendered, and (c) to pay “within a reasonable time” an amount sufficient to pay for all his costs and expenses for sumptuous living for the rest of his life. The plaintiff further alleges that he fully performed the agreement on his part and that the defendant, in part performance, paid all his costs and expenses during the period of rendition of services, but has failed and refused to provide plaintiff with a sum sufficient to maintain him on a stan *203 dard of “sumptuous living” for the remainder of his life, which sum plaintiff contends would be $1,500,000.
In his second cause of action, which sounds in quantum meruit, plaintiff alleges that he performed the various services for defendant for a five-year period and gave up pursuit of his separate business career. For the agreed and reasonable value of his services on the second cause of action, he seeks $1,500,000.
Defendant has moved for summary judgment pursuant to CPLR 3212 contending that the action is without merit and that the purported agreement is too vague and indefinite to be enforceable; that defendant’s obligations under the alleged agreement are illusory; that the agreement is void for lack of consideration and that plaintiff has already been paid far in excess of the value of any purported services.
Defendant had previously moved for summary judgment pursuant to CPLR 3212 and a denial of the motion at that time was affirmed by the Appellate Division (Trimmer v Van Bomel, 51 AD2d 922). Plaintiff misconstrues the nature of that prior order, since, in clarification, the Appellate Division specifically held that its affirmance of the denial of summary judgment was “without prejudice to renewal thereof after the conclusion of pretrial procedures herein.” The Appellate Division specifically noted (supra, p 922): “We do not pass upon the merits of plaintiff’s claims or defendant’s position with respect thereto at this time”. Depositions having been concluded, defendant has moved again for summary judgment. That right to renew in these circumstances is predicated not upon the allegation of new or additional material (cf. CPLR 2221), but upon the completion of discovery. There is now a complete record before the court containing the entire recollections of both plaintiff and defendant, the only parties to the alleged agreement.
While there have been a number of cases dealing with lawsuits by one partner in a nonmarital relationship seeking to recover against the other on the basis of an express or implied agreement (Kozlowski v Kozlowski, 80 NJ 378; Hewitt v Hewitt, 77 Ill 2d 49; Warren v Warren, 94 Nev *204 309), the court in this case is not confronted with the public policy considerations which compel the judiciary to uphold the institution of marriage and to distinguish its consequences from less formal and less permanent living arrangements. No meretricious relationship appears to be here involved. At best, plaintiff may be regarded as a companion and paid escort, and not as a substitute mate. These cases are instructive, however, as to which type of agreements may be enforceable and whether recovery is to be permitted on a theory of implied contract or quantum meruit.
In this State, cases of unmarried persons living together who thereafter seek financial recovery frequently run afoul of the theory that a contract founded upon an agreement to live together as man and wife will not be enforced. (Civil Rights Law, § 80-a.) While one may not claim compensation for having been a paramour, if there are services rendered which are nonsexual in nature and do not arise directly from such a relationship, then such services may be deemed separable, and form the basis for compensation. (See, e.g., Matter of Gorden, 8 NY2d 71; 6A Corbin, Contracts, § 1476, p 622; 15 Williston, Contracts, § 1745; Restatement, Contracts, § 589.)
The extramatrimonial case involving a claim for the value of services rendered which has received the most publicity to date is Marvin v Marvin (18 Cal 3d 660). In that case the California Supreme Court had reversed the dismissal of Michelle Marvin’s complaint as a de facto spouse, and remanded the matter for trial to determine whether or not she was entitled to recovery on an express or implied contract. It was not the holding of the California court that a mistress was entitled to “palimony”. At Trial Term, the court found that the allegations that there had been an explicit contract to compensate the plaintiff were not borne out by the facts. Nevertheless, the court, exercising its equitable powers, decided to award the sum of $1,000 per week for a two-year period to enable the plaintiff, who had allegedly given up her budding career, to rehabilitate herself. (See, also, Latham & Latham, 274 Ore 426; Tyranski v Piggins, 44 Mich App 570; Omer v Omer, 11 Wash App 386; Carlson v Olson,_Minn_, 256 *205 NW2d 249.) Interestingly, on the same day that Michelle Marvin was awarded “severance pay” by the California trial court, in New York the female companion of rock star Peter Frampton was cut off without compensation. (McCall v Frampton, 99 Misc 2d 159.)
The most recent case in this State dealing with extramarital contracts is Morone v Morone (50 NY2d 481). In that case, as here, two causes of action were alleged — the first based upon implied contract and the second alleging an explicit oral “partnership agreement”. The concept of an implied contract to compensate for services was declared by the court (supra, p 484) “to be conceptually so amorphous as practically to defy equitable enforcement”. Nevertheless, the court concluded that the allegations of an express contract that the woman would furnish domestic services and the man was to have full charge of business transactions and that the “net profits” from the partnership were to be shared equally, set forth an enforceable cause of action. Evidently, “housewifely” services are to be distinguished from such other services as may be rendered during the course of a living-together relationship. When the “tainted” consideration for such contracts is removed, the claim for recovery in extramarital cases stands in precisely the same posture as in this case. (See Foster and Freed, “Marvin”: New Wine in Old Bottles, NYLJ, April 23, 1979, p 1, col 2; cf. Draznin v Wasserman, NYU, Aug. 28, 1980, p 11, col 4.)
In this case, the services for which plaintiff seeks compensation on a quantum meruit basis, like those in a quasi-marital relationship, arise out of the nature of the relationship of the parties to one another. The services involved — to devote time and attention to the defendant, to allow her wishes to prevail concerning his deportment, habits and associations and to act as companion, to accompany defendant to restaurants, to travel with her, to accept gifts and jewelry, clothing and motor cars from her are of a nature which would ordinarily be exchanged without expectation of pay. (See Rubenstein v Kleven, 261 F2d 921; Robinson v Munn, 238 NY 40, 43; Matter of Adams, 1 AD2d 259, affd 2 NY2d 796; Matter of Basten, 204 Misc 937; Matter of Mulderig, 196 Misc 527.) As Judge Meyer noted in Morone *206 v Morone (50 NY2d 481, 488, supra): “As a matter of human experience personal services will frequently be rendered by two people * * * because they value each other’s company or because they find it a convenient or rewarding thing to do * * * For courts to attempt through hindsight to sort out the intentions of the parties and affix jurai significance to conduct carried out within an essentially private and generally noncontractual relationship runs too great a risk of error. Absent an express agreement, there is no frame of reference against which to compare the testimony presented and the character of the evidence that can be presented becomes more evanescent. There is, therefore, substantially greater risk of emotion-laden afterthought, not to mention fraud, in attempting to ascertain by implication what services, if any, were rendered gratuitously and what compensation, if any, the parties intended to be paid.”
As to personal services between unmarried persons living together or unmarried persons whose actions flow out of mutual friendship and reciprocal regard, there is very little difference. An implied contract to compensate for those things which are ordinarily done by one person for another as a matter of regard and affection should not, under these well-established principles, be recognized in this State. Plaintiff has already received $300,000 from the defendant during the course of their relationship. What further “obligation” can be implied?
The claims of friendship, like the claims of kinship, may be many and varied. To imply an obligation by a wealthy friend to compensate a less wealthy companion for being together, dining together, talking together and accepting tokens of regard stretches the bond of friendship to the breaking point. The implied obligation to compensate arises from those things which, in normal society, we expect to pay for. An obligation to pay for friendship is not ordinarily to be implied — it is too crass. Friendship, like virtue, must be its own reward.
Accordingly, the second cause of action, founded in implied contract, must be dismissed.
*207 The first cause of action, however, alleges an express agreement to pay the plaintiff. For the purposes of this motion for summary judgment, the court must accept as true plaintiff’s allegation that defendant agreed to set up a fund which would permit plaintiff to live for the rerpainder of his life in the sumptuous style to which he had become accustomed. While defendant denies that there were specific conversations about setting up a fund, she does admit having discussions from time to time about making finances available to the plaintiff. She denies, however, and the plaintiff’s testimony in his deposition confirms, that no specific dollar amounts were ever specified, no time for performance was ever set and no conditions as to the manner of payment were given, nor was anything ever said about what would happen if the relationship between the parties terminated. Thus, the principal issue presented is whether such an agreement as alleged in the complaint, and as expanded upon in plaintiff’s deposition, can be regarded as enforceable. While there is no public policy bar to such an agreement, as an alleged express oral contract, its validity must be tested exactly the same as other contracts. Such a contract is not conceptually invalid, as has been recognized by the Appellate Division in affirming a denial of summary judgment upon the pleadings alone, but with the affidavits and depositions presently before the court, problems of the sufficiency of proof have been left for further elucidation. Since not only the pleadings, but all the proof by the sole witnesses to the transaction have been placed before the court, this court must determine whether an enforceable and valid contract has been spelled out.
Unlike the situation in Morone, where the plaintiff alleged an explicit partnership agreement in which she asserted that all the “net profits” from the partnership were to be used and applied to the equal benefit of plaintiff and defendant, so that the specific dollar amount, although not indicated, can be calculated upon an accounting by one partner to another (Morone v Morone, 50 NY2d 481, supra; Partnership Law, §§ 43, 44), there is no ready means of arithmetic calculation to determine what amount plaintiff claims as his just dues.
The dissenting opinion in Morone found even the claim *208 for an equal division of all net profits to be entirely too vague and “lacking is any statement of the standard of support and maintenance to be provided”. (Morone v Morone, supra, p 490.) Here the vagueness is compounded, and the mists of ambiguity render the agreement formless and inchoate.
All courts would agree with the doctrine, although not necessarily the application, that as a basic premise of contract law “ Tt is a necessary requirement in the nature of things that an agreement in order to be binding must be sufficiently definite to enable a court to give it an exact meaning’ (1 Williston, Contracts [3d ed], § 37).” (Morone v Morone, supra, p 490 [Jones, J., dissenting].) In Dombrowski v Somers (41 NY2d 858), a unanimous Court of Appeals found that an alleged oral agreement, pursuant to which the decedent said that in return for plaintiff’s services he would “take care of’ the plaintiff, was too vague to spell out a meaningful promise.
The question in this case is whether an alleged agreement by defendant to pay an amount sufficient to take care of all of plaintiff’s “costs and expenses for sumptuous living and maintenance for the remainder of his life” as amplified by plaintiff’s testimony, will enable the court to award plaintiff a judgment in a specific sum of dollars. It is clear from the pretrial depositions of both parties, that no specific dollar amount, or approximate dollar amount, of any alleged fund was ever discussed. No facts are presented which would tend to establish a meeting of minds as to the definition of “sumptuous living”. In his 237-page bill of particulars, plaintiff asserted that the defendant had agreed “to provide and set up for him a fund, either by giving him a block of stock or cash, or both, which would take care of all his living expenses in the same expensive style for the rest of his life.” Plaintiff is alleging, in essence, a contract of employment, but as reference to his own testimony indicates, there was no specification as to the length of the term, the amount of the compensation, the terms of the payment, the nature of the duties, the manner in which the employment could be terminated and the method of computing “severence pay”. Plaintiff’s deposition indicates that there was no specific time at which the *209 alleged agreement was worked out, but rather that it developed as part of numerous conversations over an extended period of time, and it is clear that he commenced his “employment” long before any such agreement to take care of him for the rest of his life was discussed.
With respect to the alleged promise of the defendant to set up a “fund” to take care of his needs for “sumptuous living”, no specifics were ever discussed. Plaintiff testified:
“Q. Did she tell you how much the fund was to consist of?
“A. No, she did not.
“Q. Did she tell you upon any occasion how much this fund was to consist of?
“A. No, she did not.
* * *
“Q. Was the figure of One Million Five Hundred Thousand Dollars ever mentioned either by yourself or Mrs. Van Bomel at any time during the period of 1968 through 1973 in connection with your agreement with Mrs. Van Bomel?
“A. No.
“Q. Did you ever discuss with Mrs. Van Bomel at any time ... the number of dollars which this fund that you testify she was going to give you was going to consist of?
“A. No.
“Q. Did you ever discuss the approximate number of dollars that this fund was to obtain?
“A. No.”
Nor, admittedly, was there ever any discussion about what was necessary for the plaintiff’s living expenses either at that time or at some point off in the future.
“Q. Did you have any conversations with Mrs. Van Bomel during the period of 1968 to 1973 in which the gross dollar amount of your living expenses was discussed?
“A. No. Not that I recall.
“Q. Did you ever have conversations with Mrs. Van Bomel during the period of 1968 to 1973 as to the gross dollar amount of your living expenses would be in the future, subsequent to 1973?
*210 “A. No.”
When was the fund to be turned over? Was it to be before he commenced his employment? Clearly not, since he began his employment long before these alleged conversations took place. Was it to be when his employment terminated? Would it be by turning over a large sum to plaintiff to be used in his discretion? Would it involve the creation of a trust in which the plaintiff would be the life beneficiary? None of these questions are answered by the plaintiff’s testimony.
“Q. Did she tell you on any occasion when she would give you this fund?
“A. No.
“Q. Did she tell you the year in which she would give you this fund?
“A. No.
“Q. Did she tell you she would give you this fund within a certain specific period of time?
“A. No.
* * *
“Q. Did you ever state in substance during the period of 1968 to 1973 that you would cease providing services to Mrs. Van Bomel unless she established the fund by any given date?
“A. No.
* * *
“Q. Did you ever have any discussion with her during this period of time as to the manner in which this fund would be transferred to you?
“A. No.
* * *
“Q. Did you have any recollection as to what the specific words she used in these specific conversations were?
“A. I know that she told me at the time that she would set up a fund for me. She would do it in some way. She would have to discuss it with her accountants ... it could be a block of stock, it could be with cash. She was the one to determine how it would be done.”
*211 What we are talking about, then, at best is “a fund” in some unspecified amount to be set up on some unspecified date in some unspecified manner, and that it was wholly in the discretion of the defendant. The agreement boils down to these words, “She would do it in some way ”
Plaintiff has attempted to overcome the inherent vagueness of this “agreement” by trying to spell out, after the fact, what amounts he deems to be required for “sumptuous living”. What is “sumptuous” to one person may be merely adequate to another, of course.
“Sumptuous” is defined as involving great expense; costly, lavish, magnificent (Webster’s Dictionary, Unabridged [2d ed], p 1825, e 3; accord American Heritage Dictionary of English Language, p 1289, c 2).
Moreover, sumptuous living “cannot be computed from anything that was said by the parties or by reference to any document, paper or other transaction” (Varney v Ditmars, 217 NY 223, 227) nor would it be provable by evidence of custom (supra, p 233 [Cardozo, J., dissenting]). Nor, for that matter, could defendant be required to account since no partnership agreement is alleged and additionally, defendant’s vast holdings were accumulated before she had ever met plaintiff. Essentially, then the amount was left subject to the will of the defendant or for further negotiation. Courts cannot aid parties who have not specified the terms of their own agreements (Varney v Ditmars, supra; Royal Bank of Canada v Williams, 220 App Div 603; see, generally, Simpson, Contracts, Certainty of Terms, p 67; Uniform Commercial Code, § 2-305, subd [4]).
Plaintiff calculates that since he was given an average of $71,672 (tax free) by Mrs. Van Bomel during their five-year relationship, that this is the sum he should be given for the rest of his life. That is how he comes to the $1,500,000 set forth in the ad damnum. One million five hundred dollars in six-month certificates would give him $180,000 a year and that same sum in tax-free municipals would produce well over $100,000 per year, in which case the principal would be left intact. It appears clear that we are dealing with an alleged agreement which is too vague *212 in any of its material terms to be deemed enforceable. No amount being specified, no time having been set forth, no mechanics for the payments having been spelled out and there being no specification as to what had to be done to qualify or disqualify the plaintiff for the payments, what we have, at best, is some vague but legally unenforceable reassurance that plaintiff “would be taken care of’.
Since plaintiff alleges an express agreement which is to be governed by the law applicable to all contracts, it is instructive to compare the kind of agreement upon which plaintiff relies with other, more detailed contracts which the courts have nevertheless found to be unenforceable. Thus, in Brause v Goldman (10 AD2d 328), where negotiations had progressed to a point of much greater detail than what was involved here, the court found that many of the essentials of an agreement were lacking. In that case, the court declared (supra, p 332): “When the wording *** exchanged between the parties reveal no present intent to form a binding contract, but rather to continue negotiations with the possible ultimate meeting of minds deferred until some future time, either party may withdraw with impunity prior to that time (Robinson v. Grace, 278 App. Div. 693; Arnold v. Rothschild’s Sons Co., 37 App. Div. 564, affd. 164 N. Y. 562).” Further, “The absence of any of the essential elements of an agreement is a bar to its enforcibility (Willmott v. Giarraputo, 5 N Y 2d 250; 1130 President St. Corp. v. Bolton Realty Corp., 300 N. Y. 63, 68).” (Supra, p 333.) The court found that even though there were memoranda of agreement prepared after oral negotiations, there was no indication as to the date on which the arrangement was to be commenced nor as to the method of payment, nor as to the rights of the parties in the event of various contingencies coming to pass. The Appellate Division declared, “It is not for the court to dictate such terms to the parties, for its function is to enforce agreements only if they exist, and not to create them by the imposition of such terms as it considers reasonable. (See Mayer v. McCreery, 119 N. Y. 434; Weill Co. v. Creveling, 181 App. Div. 282, affd. 223 N. Y. 672.)” (Supra, p 334.)
In essence, if the relationship between the plaintiff and defendant was that of employer and employee rather than *213 that of friends or benefactress and protégé, then clearly it was an employment relationship terminable at will. Plaintiff recognized that he would be rendering services at the pleasure of Mrs. Van Bomel, and that could be for months, for years or on into the indefinite future. Plaintiff testified, “The discussion was that I was to start doing this for her. There was no time limit put on it * * * I knew that if she decided that she would like to terminate my employment with her, she could do that. She had a perfect right to do that.” Would a defendant be bound by a committment to put up a fund of $1,500,000 for someone who rendered “services” to her for a matter of months by accompanying her to restaurants such as Lutece and the Palm Court? Plaintiff would accompany the defendant to lunch two or three times weekly. He agreed that the defendant never imposed any restrictions upon his activities. For these companionable social activities, it cannot be said that defendant, or her estate, is to be bound for the rest of plaintiff’s life.
In an agreement terminable at will, and with no clear bounds and parameters set forth, an alleged obligation which would continue and survive beyond the termination of employment must appear with specificity. What if the relationship had been terminated for “cause”? Suppose plaintiff had been disloyal or discourteous or had secretly embezzled some of defendant’s funds, would the agreement to take care of him for life continue nevertheless? Since this relationship was terminable at will, and the relationship had come to an end, this court can see no legal basis upon which the defendant can be compelled to continue lavishing her favors and her bounty upon the plaintiff. There are no guarantees in life, and good fortune, to be enjoyed while it lasts, does not invariably bring with it a life-long annuity. It was defendant who decided to get plaintiff tickets for the Royal Enclosure at Ascot, to buy him fabrics in London to be tailored in Rome. It was defendant who took pleasure in seeing that plaintiff’s shoes came from Gucci and his accessories from Saks. When the relationship is terminated, the law does not compel the usufructs of the dead relationship to continue.
*214 Accordingly, defendant is entitled to summary judgment on the first cause of action as well as the second. The complaint should be dismissed.