**CANDID PRODUCTIONS, INC.,**
Plaintiff,

v.

**INTERNATIONAL SKATING UNION**
**and Beat Hasler, Defendants.**

No. 80 Civ. 2966.

United States District Court,
S. D. New York.

Jan. 29, 1982.

Hawkins, Delafield & Wood, New York City, for plaintiff; W. Cullen Mac Donald, Philip R. Hoffman, New York City, of counsel.

Coudert Brothers, New York City, for defendants; Eugene L. Girden, Peter M. Nelson, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This action arises out of a series of contracts granting Candid Productions, Inc. ("Candid") the exclusive North American television rights for certain amateur ice skating championships sponsored by the International Skating Union ("ISU"). Candid, the plaintiff, is engaged in the business of purchasing television rights to sporting events, principally skating events and produces programs of such events for sale to

television companies all over the world. Defendant, ISU, is the governing body for amateur competitive ice skating and defendant, Beat Hasler, is one of its corporate officers.

ISU sanctions six championships per year—three each in figure and speed skating. Over the past sixteen years, it has granted Candid the North American television rights for certain of these events for specific years. The instant action concerns four such contracts: the 1980–82 World Figure Skating Championships ("World's"); the 1979–81 European Figure Skating Championships ("European's"); the 1979 World Sprint Speed Skating Championships ("Sprint's"); and the 1980 World Women's Speed Skating Championships ("Women's Speeds"). Each of these contracts is about to or has expired and ISU has granted the television rights for the next series of these events to the Columbia Broadcasting System ("CBS").[1] Candid contends that thereby ISU has breached a good faith negotiation clause contained in its contracts for the World's and European's, the first refusal clauses of the Sprint's and Women's Speeds' contracts and seeks equitable relief, or, in the alternative, damages. The defendants move for partial summary judgment only as to the 1980–82 World's and the 1979–81 European's on the ground that the good faith negotiation clauses contained in those contracts are so vague and uncertain so as to be unenforceable as a matter of law.

I.

The parties have had a contractual relationship extending over a sixteen-year period which terminated shortly before the commencement of this action. Candid's purchase of television rights from ISU began on June 10, 1965 when the parties entered into agreements for the 1967–69 World's and the 1966–68 European's.[2] Each of these two contracts contained an identical right of first refusal clause that required ISU to engage in a period of negotiations with Candid for the rights to the next set of championships and granted Candid a right to match any competing offer by a third party if agreement was not reached during the initial negotiation period. The clause, referred to as a good faith negotiation and first refusal right, provides:

> The ISU hereby grants to Candid the right of first refusal to extend their exclusive North American television rights to the [European Championships or World Championships] for an additional three year period. This right of first refusal shall work as follows: Candid and the ISU agree to negotiate in good faith the terms and conditions by which these rights shall be extended. If Candid and the ISU do not come to an agreement, the ISU shall then be free to offer these rights to a third party under the same terms and conditions last offered to Candid. The ISU agrees, however, that should it offer the rights under terms and conditions less favorable than those last offered to Candid, it will first offer the rights under the new terms and conditions to Candid who shall have thirty days in which to accept them. These offerings and acceptances shall be made in writing or by telegram to the respective offices of Candid and the ISU.

This right of first refusal was continued almost verbatim in the contracts for the 1970–72 World's and the 1973–76 World's with the only substantive change that specific beginning and end dates were fixed

---

**1.** In addition to the four championships that are at issue in this action, ISU also sponsors the World Junior Figure Skating Championships and the World Men's Speed Skating Championships, which are also included in the current ISU–CBS contract.

**2.** The parties' business relationship extends over twenty years, but prior to 1965, Candid had purchased the rights to the World's competition directly from the ISU member association hosting the competition for the particular year. In March 1964, ISU modified its regulations and notified Candid that beginning with the 1967 World's, all contracts would be made directly with ISU.

for the initial good faith negotiation period.[3]

The parties contracted for the European championships less regularly. After the initial contract for the 1966–68 European's, the next contract was for the 1973–74 competitions. The draft of that contract contained a right of first refusal but such clause was deleted from the final contract. Again there was a gap until the contract for the 1977 European's. This contract also did not contain a right of first refusal but did grant Candid an exclusive option to purchase the television rights for the 1978 European's.

Denial of the right of first refusal and substitution of the type of good faith negotiation provision which is at the heart of this controversy occurred during negotiations for the 1977–79 World's. That contract, drafted as were all the contracts by Dick Button, President of Candid, contained a grant to Candid of a right of first refusal. However, ISU refused to sign the draft unless the first refusal clause was eliminated. The parties, thereupon, agreed to eliminate that requirement and substituted a provision that ISU would "not negotiate any further contracts for the rights for the World Championships after 1979 without negotiating in good faith with Candid." Thereafter, in executing the contract for the 1979–81 European's, one of the two contracts at issue here, the parties again deleted the first refusal provision as originally drafted by Button, and substituted a good faith negotiation clause. The provision reads:

> The ISU agrees that it will not negotiate any further contract for the rights to the

European Championships after 1981 without negotiating in good faith with Candid.

Finally, on June 1, 1978, the parties entered into the contract for the 1980–82 World's, the other contract at issue here. The good faith negotiation clause in that contract is as follows:

> The ISU agrees that it will not negotiate any further contract for the rights for the World Championships after 1982 without *first* negotiating in good faith with Candid.[4] (Emphasis supplied.)

Discussion between Candid and ISU concerning television rights to the World's after 1982 began in February 1980 at the Winter Olympic Games at Lake Placid, New York. The parties met again in the middle of March in Dortmund, Germany at the World's skating competition where ISU informed Candid that instead of contracting for a single event for a period of years, as they had in the past, it wanted to structure the contract to cover all six ISU championships for a five-year period—a package deal. Since Candid was unprepared to make an offer of that type at the time, the parties agreed to and did later meet in Davos, Switzerland and then again met for the last time on April 16, 1980 in Paris, France. None of these discussions resulted in an agreement. During this same period, Candid alleges that even prior to its first discussions on a renewal of the contracts, ISU had met and negotiated with representatives of CBS. The result of those discussions was a five-year contract whereby ISU granted CBS the exclusive television broadcast rights for all six ISU-sponsored skating championships.

---

**3.** For example, the contract for the 1970–72 World's stated:

Such negotiation shall commence not later than January 1, 1971 and if agreement is not reached by May 15, 1971, the ISU shall then be free to offer these rights to third parties under the same terms and conditions last offered to Candid.

**4.** The two clauses differ only in that the contract for the 1980–82 World's contains the word "first." The parties disagree over whether the inclusion of this word was by mutual consent. The plaintiff contends, however, that

in both instances the defendant is required first to negotiate with it in good faith and unless it does so, it is barred from negotiating with any other party. The defendant contends that at least with respect to the contract which does not include "first," it is free to conduct contemporaneous negotiations with third parties. In view of this Court's judgment that the provision is unenforceable for reasons stated, the inclusion of the word "first" whether expressly stated or inferred, is of no material consequence.

Plaintiff contends that ISU breached its good faith negotiation obligation to it by having discussions with CBS and consummating an agreement with CBS prior to its negotiating with Candid and also by its conduct during its negotiations with Candid. Specifically, Candid claims that ISU failed to exchange counteroffers; to disclose the terms offered by CBS; or to accept Candid's proposal to top the price offered by CBS—in sum, that it did not negotiate with plaintiff in good faith. The defendants, solely for the purpose of this motion, do not dispute the validity of Candid's charges of bad faith.[5] Instead, they argue that regardless of such conduct, the good faith negotiation clauses contained in the contracts and relied upon by plaintiff are so vague and uncertain as to be unenforceable.

The motion is presented as one of law based solely upon the clauses at issue. The language is clear and unambiguous. In this circumstance, the construction of the contract is for the Court.[6] The motion turns upon ISU's undertaking as expressly stated. Candid incorrectly urges that the primary issue to be decided is "[w]hether the ISU lived up to the obligation imposed upon it."[7] This puts the cart before the horse and jumps the issue before the Court on this motion. The threshold question is whether the obligation is enforceable;[8]

only if it is found to be enforceable is the question posed by Candid, "whether the ISU lived up to its obligation," reached. And that issue, upon the papers here presented, raises issues of fact which foreclose summary judgment. Thus we address the initial question whether the undertaking is enforceable either at law or equity.[9]

## II.

At the outset, it is noted that Candid stresses the inadequacy of a remedy at law based upon the difficulty of ascertaining monetary damages; accordingly, it contends that it is entitled to equitable relief, to wit, an injunction to prohibit ISU from (1) permitting or facilitating North American broadcasts of the European's after 1981 and the World's after 1982 and (2) negotiating or performing any further contract for such broadcasts without first negotiating in good faith with it.

■■■■ It is well settled that for a contract to be valid, the agreement between the parties must be definite and explicit so their intention may be ascertained to a reasonable degree of certainty.[10] Even if the parties believe they are bound, if the terms of the agreement are so vague and indefinite that there is no basis or standard for deciding whether the agreement had been

---

**5.** The defendants do contend that in fact they did negotiate with plaintiff in good faith.

**6.** See Heller & Henretig Inc. v. 3620–168th Street, Inc., 302 N.Y. 326, 330, 98 N.E.2d 458 (1951); Hartigan v. Casualty Co. of America, 227 N.Y. 175, 179–180, 124 N.E. 789 (1919); Meyers v. Selznick Co., 373 F.2d 218 (2d Cir. 1966); Hong Kong Export Creditors Ins. Co. v. Dunn & Bradstreet, 414 F.Supp. 153 (1975).

**7.** Brief for Plaintiff at 95.

**8.** See Soar v. National Football League Players' Ass'n, 550 F.2d 1287, 1289 (1st Cir. 1977) (summary judgment affirmed where alleged contract was too indefinite to be enforced).

**9.** The parties agree that New York law governs and one of the contracts expressly so provides.

**10.** Dombrowski v. Somers, 41 N.Y.2d 858, 362 N.E.2d 257, 393 N.Y.S.2d 706 (1977) (mem.); St. Regis Paper Co. v. Hubbs & Hastings Paper Co., 235 N.Y. 30, 138 N.E. 495 (1923); Varney

v. Ditmars, 217 N.Y. 223, 111 N.E. 822 (1916); Brown & Guenther v. North Queensview Homes, Inc., 18 A.D.2d 327, 239 N.Y.S.2d 482 (1963); Trimmer v. Van Bomel, 107 Misc.2d 201, 434 N.Y.S.2d 82, 86, 88 (1980); Interocean Shipping Co. v. National Shipping & Trading Corp., 462 F.2d 673, 676 (2d Cir. 1972); Ginsberg Machine Co. v. J. & H. Label Processing Corp., 341 F.2d 825, 828 (2d Cir. 1965); Hong Kong Export Credit Ins. Corp. v. Dunn & Bradstreet, 414 F.Supp. 153, 156 (S.D.N.Y.1975); 1 Corbin, Contracts § 95 (2d ed. 1963) ("A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think they·have made a contract; they must have expressed their intentions in a manner that is capable of understanding. It is not enough that they have actually agreed; if their expressions when interpreted in the light of accompanying factors and circumstances are not such that a court can determine what the terms of the agreement are"); Restatement (Second) Contracts, § 33 (1981).

kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract.[11] The rule applies with special force where the extraordinary relief of specific performance is sought.[12] These established principles have recently been reaffirmed by the New York Court of Appeals in *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*[13] where in holding "a bald agreement to agree on a future rental" unenforceable as a matter of law, the Court stated:

> [B]efore the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained. Otherwise, a court, in intervening, would be imposing its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves. Thus, definiteness as to material matters is of the very essence of contract law. Impenetrable vagueness and uncertainty will not do.[14]

Plaintiff argues that the good faith negotiation clauses are enforceable as written citing in support cases that recognize the validity of an obligation to negotiate in good faith in order not to defeat the purpose of an otherwise enforceable contract.[15] Thus, for example, in *De Laurentiis v. Cinematographica De Las Americas, S. A.*,[16] the parties had entered into a contract to produce and distribute a motion picture. It was a fully executed agreement. As part of the contract, De Laurentiis promised to "make every effort in good faith to cause to be created . . . a story outline, screen treatment and final scenario acceptable to both" himself and the author of the book on which the picture was based. In holding that whether De Laurentiis did all that was required was an issue susceptible to arbitration, the court recognized good faith negotiation as an enforceable aspect of the performance required under the contract.

*De Laurentiis*, however, does not assist the plaintiff here, for in that case the purpose of the contract, the production and distribution of a motion picture was clear and definite and provided a reference by which defendant's performance could be evaluated. The case is an application of the obligation of good faith performance that is read into every contract and that requires a party not to act so as to defeat the purpose of the agreement.[17] Where the parties are

**11.** *Metro-Goldwyn-Mayer Inc. v. Scheider*, 40 N.Y.2d 1069, 360 N.E.2d 930, 392 N.Y.S.2d 252 (1976); *May Metropolitan Corp. v. May Oil Burner Corp.*, 290 N.Y. 260, 49 N.E.2d 13 (1943); *Borden v. Chesterfield Farms, Inc.*, 27 A.D.2d 165, 277 N.Y.S.2d 494 (1967); *Brookhaven Housing Coalition v. Solomon*, 583 F.2d 584, 593 (2d Cir. 1978); *V'Soske v. Barwick*, 404 F.2d 495, 500 (2d Cir. 1968), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *Allen & Co. v. Occidental Petroleum Corp.*, 382 F.Supp. 1052, 1057–58 (S.D.N.Y. 1975), *aff'd*, 519 F.2d 788 (1975).

**12.** *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 110, 417 N.E.2d 541, 543, 436 N.Y.S.2d 247, 249 (1981).

**13.** 52 N.Y.2d 105, 417 N.E.2d 541, 436 N.Y.S.2d 247 (1981).

**14.** 52 N.Y.2d at 109, 417 N.E.2d at 543, 436 N.Y.S.2d at 249. Plaintiff's attempts to distinguish *Martin* on a claim that it involved real estate overlooks the Court's expressed view that the rule against the enforcement of indefinite contracts reflects "an issue of the very essence in contract law." *Id.*

**15.** *See, e.g., Sommer v. Hilton Hotels Corp.*, 376 F.Supp. 297, 302 (S.D.N.Y.1974) (where part payment is made under a binder the party making the payment may not recover it thereafter if he has willfully refused to make a genuine effort to reach an agreement as to details left open for subsequent adjustment); *Chase Nat. Bank v. Manufacturers Trust Co.*, 265 App.Div. 406, 39 N.Y.S.2d 370 (1943) (parties to a close corporation stockholders trust agreement were under an enforceable duty to participate in good faith in periodic bargaining or negotiation).

**16.** 9 N.Y.2d 503, 174 N.E.2d 736, 215 N.Y.S.2d 60 (1961).

**17.** *Rowe v. Great Atlantic & Pacific Tea Co.*, 46 N.Y.2d 62, 385 N.E.2d 566, 412 N.Y.S.2d 827 (1978); *Gordon v. Nationwide Mutual Ins. Co.*, 30 N.Y.2d 427, 285 N.E.2d 849, 334 N.Y.S.2d 601 (1972), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1374, 35 L.Ed.2d 593 (1973); *Wood v. Lucy,*

under a duty to perform that is definite and certain the courts will enforce a duty of good faith, including good faith negotiation, in order that a party not escape from the obligation he has contracted to perform.[18] Such cases are inapposite here, however, for the issue involved on this motion is not that of good faith, but rather whether the promise by ISU to negotiate is sufficiently certain, or can be made so, such that this Court can enforce it.[19]

Candid attempts to make the obligation to negotiate sufficiently certain and definite by arguing that this Court imply as a requirement of good faith negotiation a duty by ISU: (1) to disclose information material to Candid's ability to formulate offers; (2) to make offers and counter-offers; and (3) to continue negotiations for a sufficient minimum period of time before signing with another to permit Candid a fair opportunity to overcome in all respects the comparative attractiveness of competitive proposals.[20] To imply such terms, however, would be to impermissively make a contract for the parties rather than to enforce any bargain the parties themselves may have reached.[21] Any reliance upon *Wood v. Lucy, Lady Duff-Gordon*[22] to support the implication of such specific obligations is misplaced. As then Circuit Judge, now Mr. Justice Marshall stated referring to the classic principle of that case, "[w]e decline to fill this void by implication. Here the void is too great, the omissions are too noticeable, and the risk of ensnaring a

party in a set of contractual obligations that he never knowingly assumed is too serious."[23] Nor can the parties' prior course of dealing be used to give meaning to the obligation to negotiate for those negotiations[24] were conducted under the dictates of a time limitation and first refusal clause that is absent from these contracts. Further, it is particularly inappropriate to imply the terms proposed by Candid for in effect Candid is asking the Court to reinsert into the contract the specific obligation that ISU expressly rejected by its demand, agreed to by the plaintiff, that the first refusal clause containing such requirement be deleted from the contract.

Alternatively, Candid argues that the Court can enforce the negotiation clause as written, because it contends each clause contains an express negative covenant that mandates that ISU will not negotiate with others before it has negotiated in good faith with Candid. Thus, while acknowledging that the Court may encounter difficulty in ordering ISU to specifically perform its affirmative promise to negotiate in good faith, Candid contends that all such difficulties would "vanish" were the Court to simply enjoin ISU from breaching the negative covenant contained in the agreement.[25] Candid alleges that the negative covenant expressed in the agreement imposes upon ISU the obligation "to have at least commenced *meaningful* negotiations with Candid before commencing negotiations with

*Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917).

18. *See, e.g., Nuvest, S. A. v. Gulf & Western Industries, Inc.*, 649 F.2d 943, 947 (2d Cir. 1981); *Carnegie v. Abrams*, 37 A.D.2d 327, 325 N.Y.S.2d 326 (1971).

19. *Cf. Petze v. Morse Dry Dock & Repair Co.*, 125 App.Div. 267, 109 N.Y.S. 328 (1908), *aff'd sub nom Graves v. Gustave Stickley Co.*, 195 N.Y. 584, 89 N.E. 1101 (1909).

20. Brief for Plaintiff at 64.

21. *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 417 N.E.2d 541, 436 N.Y.S.2d 247, 249 (1981).

22. 222 N.Y. 88, 90–91, 118 N.E. 214 (1917) ("The law has outgrown its primitive stage of

formalism when the precise word was sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed [citation omitted]. If that is so, there is a contract.")

23. *Ginsberg Machine Co. v. J. & H. Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir. 1965).

24. Except for the contract for the 1977–79 World's, each of the prior contracts between the parties over the past 16 years that contained a renegotiation provision included a right of first refusal.

25. Brief for Plaintiff at 84.

others"[26] and that ISU breached this obligation by its negotiations with CBS. Candid claims that this Court can enforce such an express negative covenant by issuing an order enjoining ISU from negotiating or performing any contract for the North American television broadcast of the skating championships until it has completed its obligation to negotiate in good faith with Candid.

Even assuming that Candid's interpretation of the negotiation clauses is correct, and that they contain an express negative covenant that prohibits ISU from negotiating with others before it has negotiated with Candid, it does not change the vague and uncertain nature of the obligation to negotiate. Whether ISU was bound to negotiate exclusively with Candid before negotiating with anyone else, as the alleged negative covenant would require, does not relieve or assist this Court in its burden to find some standards by which to judge the parties' performance. Indeed, such negative covenant only worsens the situation for the negotiation clauses are silent as to the length of time such exclusive negotiation period is to run.[27]

■ The Court finds persuasive the reasoning from the established line of cases that in ordinary commercial situations "a mere agreement to agree" is unenforceable for indefiniteness where material terms are left open for future resolution.[28] The principles inherent in such cases apply here with

added force for not only one item but all terms have been left open for future negotiation. Further, unlike "agreements to agree" the parties here have not even committed themselves to contract; they have only agreed to negotiate. Thus, as is the case with "agreements to agree" where a material term is left open, the promise is unenforceable for it fails to show that the parties assented to the same obligation.[29] As our Court of Appeals held in *Necchi S.P.A. v. Necchi Sewing Machine Sales Corp.*[30] where the claim was a failure "to negotiate in good faith an extension of a distributorship agreement":

> [I]t is impossible to say what relief would be appropriate if Necchi failed to examine the possibility of a renewal. Certainly, we cannot ask that a renewal contract be written for the parties, as it is altogether too conjectural that the parties would have agreed and on what terms. It is impossible to assess any damages, as there is no way that anyone could foresee what would have come from examining the possibility of executing a new contract, even if this were done in the utmost good faith.[31]

■ While the power of the Court to fashion in appropriate cases an equitable remedy is great, it does not encompass the right to make an agreement for the parties. To issue a decree of specific performance, as plaintiff requests, would require the

---

**26.** Brief for Plaintiff at 73 (emphasis added).

**27.** *Cf. Standard Fashion Co. v. Siegel-Cooper Co.*, 157 N.Y. 60, 51 N.E. 408 (1898) (enforcement of a clear and precise negative covenant that the defendant would not "sell, or allowed to be sold, on the premises during the duration of the contract, any other make of paper patterns than those of plaintiff").

**28.** *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 417 N.E.2d 541, 436 N.Y.S.2d 247 (1981); *Willmott v. Giarraputo*, 5 N.Y.2d 250, 253, 157 N.E.2d 282, 184 N.Y.S.2d 97 (1959); *Royce Haulage Corp. v. Bronx Terminal Garage, Inc.*, 185 Misc. 892, 57 N.Y.S.2d 760 (1945) ("A promise to negotiate at a future time is not a contract; such a promise means no more than a contemplated discussion in arranging the terms of a contemplated contract"); *Harcourt Brace Jovanovich,*

*Inc. v. Farrar, Straus & Giroux, Inc.*, N.Y.L.J., Apr. 30, 1979 at 6, col. 5 (Sup.Ct., Apr. 24, 1979).

**29.** *See Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 417 N.E.2d 541, 436 N.Y.S.2d 247 (1981) ("[A] contract is a private 'ordering' in which a party binds himself to do, or not to do, a particular thing.... [B]efore one may secure redress in our courts because another had failed to honor a promise, it must appear that the promisee assented to the obligation in question.")

**30.** 348 F.2d 693, 698 (2d Cir. 1965), *cert. denied*, 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966).

**31.** *Id.* at 698.

Court to enter into the realm of the conjectural. An agreement to negotiate in good faith is even more vague than an agreement to agree. An agreement to negotiate in good faith is amorphous and nebulous, since it implicates so many factors that are themselves indefinite and uncertain that the intent of the parties can only be fathomed by conjecture and surmise.[32] Suppose the defendant, in its initial request, asks for an amount for the licensing rights which plaintiff considers exorbitant or outrageous and in its view has been advanced solely for the purpose of defeating the Court's direction to negotiate. On what basis does the Court decide that the sum is so unreasonable so that it can determine that the proposal was contrary to good faith bargaining? Is the Court then required in furtherance of its decree to direct the parties to continue negotiations until they reach an agreement or does it conclude that an impasse has resulted which reflects good faith and thereby releases the defendant to negotiate with third parties?[33] Indeed, this is by no means a hypothetical inquiry. There is no dispute that when Candid was aware that CBS was in the picture, the plaintiff jumped its original offer from a sum of $1.43 million for the total package of all the skating events to an ultimate figure of $5 million or 10% or $100,000 above any offer made by CBS, whichever was higher.

■ Further, assume that during negotiations ISU stated that it preferred not to do business with Candid particularly because plaintiff has been involved in professional figure skating championships and had sponsored a young female professional skater, activities which the defendant considered detrimental to its economic interests. Again, this is not a conjectural situation. Evidently, it was a factor that at one time led to a rift in the prior comfortable working relationship between the parties. Is the Court empowered to direct the defendant to continue negotiations despite its business judgment that it prefers not to do business with plaintiff because it deems plaintiff's activities in a given field adverse to its best interests? To do so would interfere with the defendant's "freedom to contract."[34] A commitment to good faith negotiations does not carry with it a surrender of one's right to decide not to enter into another contract with a party.[35]

Finally, by what objective criteria is it determined on a motion to cite ISU for contempt for an alleged violation of the decree that ISU's negotiations were not in good faith but that it simply went through the appearance of negotiations in an effort to satisfy the terms of the injunction?[36] With so many elements of an undefined nature open to negotiation, the provisions in the two contracts at issue are unenforceable.[37] Moreover, the suggestion by Candid that the decree contain a provision that the parties "continue the negotiations for a sufficient minimum period before signing with another to permit a fair opportunity to overcome in all respects the comparative

---

**32.** Cf. *Varney v. Ditmars*, 217 N.Y. 223, 228, 111 N.E. 822 (1916).

**33.** Cf. *Petze v. Morse Dry Dock & Repair Co.*, 125 App.Div. 267, 271, 109 N.Y.S. 328 (1908), aff'd sub nom *Graves v. Gustave Stickley Co.*, 195 N.Y. 584, 89 N.E. 1101 (1909); *Ginsberg Machine Co. v. J. & H. Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir. 1965); *Oil Trading Assoc., Inc. v. Texas City Refining, Inc.*, 303 F.2d 713, 715 (2d Cir. 1962).

**34.** *Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109, 417 N.E.2d 541, 543, 436 N.Y.S.2d 247, 249 (1981).

**35.** See *Oil Trading Assoc., Inc. v. Texas City Refining, Inc.*, 303 F.2d 713, 715 (2d Cir. 1962).

**36.** Cf. *Oil Trading Assoc., Inc. v. Texas City Refining, Inc.*, 303 F.2d 713, 715 (2d Cir. 1962).

**37.** Cf. *Varney v. Ditmars*, 217 N.Y. 223, 228–30, 111 N.E. 822 (1916); *Petze v. Morse Dry Dock & Repair Co.*, 125 App.Div. 267, 109 N.Y.S. 328, aff'd sub nom *Graves v. Gustave Stickley Co.*, 195 N.Y. 584, 89 N.E. 1101 (1909); *Necchi S.P.A. v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965), cert. denied, 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966); *Ginsberg Machine Co. v. J. & H. Label Processing Corp.*, 341 F.2d 825, 828 (2d Cir. 1965).

attractiveness of competitive proposals"[38] is hardly a thinly disguised method of reinstating the first refusal right which had been eliminated from the current contracts. This would be contrary to the parties' deliberate elimination of that provision from the contracts at issue.

Candid's contention that, even if the Court finds that injunctive relief is not available, its claim for money damages survives overlooks that a contract which fails for indefiniteness cannot support any remedy. Its reliance on dictum in *American Broadcasting Co. v. Wolf*[39] that a damage remedy may be available is misplaced for there injunctive relief was not denied because the underlying obligation was too indefinite to be enforced. In *American Broadcasting*, the contract contained a good faith negotiation and first refusal clause which, in substance, required Wolf, the defendant, to engage in exclusive good faith negotiations with the plaintiff for a forty-five day period, and if the parties failed to agree, then to be followed by a second forty-five day period during which time Wolf could negotiate, but not sign, with third parties and granted plaintiff a right of first refusal with respect to any offer received by him for the three months following thereafter and Wolf agreed "to enter into an agreement with [ABC] on such terms"—that is, the terms offered by the third party. The court, based upon the specifics of the foregoing provisions, which demonstrate a definiteness that is totally absent from the provisions at issue here, held that Wolf had breached his obligation to negotiate in good faith by signing a contract with a third party, CBS. However, the court refused to grant injunctive relief; not because the provision was too indefinite to be enforced but because of the traditional attitude of courts against the enforcement of personal services contracts, except in extreme specified instances, stating that its ruling was "without prejudice to ABC's right to pursue relief in the form of monetary damages, if it be so advised."[40] Here, in contrast, Candid's claim is based upon an undertaking that is unenforceable as a matter of law because it is vague and indefinite—such a contract does not give rise to a claim for money damages.[41] As stated in *Necchi*, "[i]t is impossible to assess any damages, as there is no way that anyone could foresee what would have come from examining the possibility of executing a new contract, even if this were done in the utmost good faith."[42]

■ The Court finds that the good faith negotiation clauses contained in the contracts for the 1980–82 World's and the 1979–81 European's are so vague and indefinite that they are unenforceable. Partial summary judgment is granted to the defendants.

So ordered.

---

**38.** Brief for Plaintiff at 64.

**39.** 52 N.Y.2d 394, 420 N.E.2d 363, 438 N.Y.S.2d 482 (1981).

**40.** 52 N.Y.2d at 406, 420 N.E.2d at 367, 438 N.Y.S.2d at 488.

**41.** *See Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y. 105, 109, 417 N.E.2d 541, 544, 436 N.Y.S.2d 247, 249 (1981) ("[B]efore one may secure redress in our courts because another has failed to honor a promise, it must appear that the promissee assented to the obligation in question.... [B]efore the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained.")

**42.** *Necchi S.P.A. v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965), *cert. denied*, 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966).