**TIME, INC. and David McClintick, Plaintiffs,**

v.

**Elliott KASTNER and The Beverly Hills Motion Picture & Moving Company, Defendants.**

No. 96 Civ. 5791(HB).

United States District Court, S.D. New York.

July 31, 1997.

David B. Wolf, Time Inc., New York City, for Plaintiffs.

Raymond J. Dowd, New York City, for Defendants.

## OPINION AND ORDER

BAER, District Judge.

Plaintiffs brought this cause of action seeking a declaratory judgment that defendants failed to acquire any of the copyright interest in an article entitled "The Predator" published by Time Inc.'s *Fortune* magazine, and claiming interference with prospective contractual relations. Defendants counterclaimed and alleged a cause of action for breach of contract, quantum meruit and fraud. Plaintiffs moved for partial summary

judgment on its first cause of action and summary judgment dismissing defendants' counterclaims. At oral argument on July 14, 1997, I granted plaintiffs' motion for summary judgment declaring that defendants have no copyright interest in the article "The Predator" and dismissing defendants' counterclaim for fraud. I denied plaintiffs' motion for summary judgment with respect to defendants' counterclaim for quantum meruit, and reserved judgment on plaintiffs' motion with respect to defendants' counterclaims for breach of contract. I write to address this remaining issue. For the reasons stated below, plaintiffs' motion for summary judgment with respect to defendants' counterclaims for breach of contract is granted.

## I. Background

David McClintick, an author of such books as *Indecent Exposure*, and Elliott Kastner, an independent movie producer, have known each other for almost fifteen years. In June 1995, McClintick called Kastner and told Kastner he was in dire financial straits and would appreciate any money Kastner could give him. Kastner sent him $5,000. Kastner alleges that the two agreed that in exchange, McClintick "pledged" his next project to Kastner (the "June 1995 agreement"). However, McClintick sent Kastner a letter on June 27, 1995 that stated that the $5,000 was a loan, repayable upon Kastner's demand at whatever interest rate he considered fair. Kastner alleges he never received this letter.

On November 14, 1995, *Fortune* magazine and McClintick entered into an agreement commissioning McClintick to write the article at issue here, *The Predator*,[1] and the agreement included a provision that it was to be a work for hire with *Fortune* owning all rights (including copyright) in and to the article. In early 1996, McClintick began work on the article. Kastner alleges that he collaborated with McClintick on the article, believing he owned the film rights. His belief, he contends, stemmed from his understanding of the alleged June 1995 agreement. On Feb-

---

1. The article tells the story of a Hollywood scandal involving Giancarlo Paretti who allegedly bribed the management at the bank Credit Lyon- nais to fund his takeover of the MGM movie studio.

ruary 24, 1996, Kastner and McClintick had lunch at Cipriani's in New York and they discussed the prospect of McClintick writing a screenplay based on the article. Kastner says it was at this meeting that he learned for the first time of McClintick's agreement with *Fortune i.e.*, that the story was a work for hire, and the fact that McClintick did not own any rights in the article. Despite this, Kastner alleges he offered McClintick $75,-000 to write the screenplay and that McClintick would use his best efforts to help Kastner buy the film rights to the article from *Fortune* (the "February 1996 agreement").

On June 6, 1996, Kastner spoke by telephone with John Huey, the Managing Editor of *Fortune*, and the two discussed the film rights to the article. Huey stated that *Fortune* might sell the rights for half of the costs they had incurred on the project. Kastner agreed that that amount sounded reasonable and asked that Huey call him back with the exact figure (the "June 1996 Agreement"). Huey never called Kastner back. Huey then hired *Amanda Urban*, a literary agent, to handle the negotiations for the sale of the motion picture rights. At Ms. Urban's request, Kastner made a bid for the motion picture rights, maintaining that he already had an agreement with plaintiffs for such rights. Kastner was informed by letter on June 28, 1996 that *Fortune* sold the film rights to Hallmark Entertainment and that McClintick subsequently accepted an offer from Hallmark to write a screenplay based on the article. This lawsuit ensued.[2]

## II. *Discussion*

Plaintiffs argue that defendants' contract counterclaims must be dismissed because they are premised on breach of oral contracts that allegedly transferred copyright ownership in the article and consequently are barred by § 204 of the Copyright Act. Plaintiffs argue, alternatively, that these alleged oral contracts are unenforceable because they are vague and indefinite. Defendant argues that the contracts fit within an exception to the rule and are not subject to § 204 and are not vague and indefinite.

## A. *June 1995 and June 1996 Agreements*

■ According to the Copyright Act, a transfer of copyright ownership is not valid "other than by operation of law ... unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the author of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a) (1996). The Copyright Act defines transfer of copyright ownership as "an assignment, ... exclusive license, or any other conveyance ... of a copyright or of any of the exclusive rights comprised in a copyright ... but not including a nonexclusive license." 17 U.S.C. § 101 (1996). Section 204 also bars breach of contract claims based on oral agreements that violate that section. *Valente–Kritzer Video v. Pinckney*, 881 F.2d 772, 774 (9th Cir.1989); *Library Publications, Inc. v. Medical Economics Company*, 548 F.Supp. 1231, 1233–34 (E.D.Pa.1982), *aff'd* 714 F.2d 123 (3d Cir.1983).

The Copyright Act, then, carves out two exceptions to the writing requirement: nonexclusive licenses and transfers of ownership by operation of law. While the Copyright Act does not define transfer by "operation of law," courts in this Circuit have noted that transfers due to bankruptcy or mortgage foreclosure, where there is evidence of the author's express or implied consent of transfer (*e.g.* his overt conduct in filing for bankruptcy), are transfers by "operation of law". *Brooks v. Bates*, 781 F.Supp. 202, 205 (S.D.N.Y.1991).

■ Kastner claims that the June 1995 oral agreement with McClintick transferred ownership in the film rights to "The Predator." Similarly, Kastner claims that during his conversation with Huey in June 1996 he "ma[de] a deal ... for the motion picture and allied rights" of the article. Def.'s Memorandum at 12. Kastner concedes that both of these alleged agreements are based on oral statements and that there are no contemporaneous writings signed by the copyright owner to support his contentions. Indeed,

---

**2.** After this lawsuit was initiated, McClintick sent Kastner a check for $5,000 in repayment of the   June, 1995 loan.

the only writing by the copyright owner, *Fortune,* is a letter dated June 27, 1996 that denies the existence of any agreement transferring the film rights in "The Predator." *See* Wolf Reply Aff. Ex. B. Kastner suggests that he and McClintick had a joint venture to create a film of "The Predator" and that therefore, ownership in the film rights to the article were transferred to Kastner by operation of law and thus no writing was required. Aside from the fact that not a scintilla of evidence save Kastner's allegations support this contention, the Ninth Circuit has observed in a well reasoned decision that due to "the ease with which joint ventures may be alleged and proved under the law in many states, acceptance of this argument would fatally undermine the Copyright Act's written instrument requirement ." *Konigsberg Int'l, Inc. v. Rice,* 16 F.3d 355, 357 (9th Cir .1994). Since § 204 requires a writing for the valid transfer of copyright interests and because here no such writings existed, Kastner's contract claims with respect to the June 1995 and the June 1996 oral agreements must fail.

### B. February 1996 Alleged Agreement

With respect to this alleged agreement, defendants contend that McClintick's promise to use his best efforts to arrange with *Fortune* the sale of the film rights to "The Predator" was an agreement that granted to Kastner the right of first refusal in the film rights. Plaintiffs argue that this alleged agreement is an unenforceable agreement to agree and therefore defendants' claim must be dismissed.

In New York, a "right of first refusal" requires the *"owner,* when and if he decides to sell, to offer the property first to the party holding the preemptive right so that he may meet a third-party offer or buy the property at some other price ." *LIN v. Metromedia, Inc.,* 74 N.Y.2d 54, 56, 544 N.Y.S.2d 316, 542 N.E.2d 629 (1989) (emphasis added). Here, all parties concede that McClintick did not own any rights in "The Predator," and therefore, he could not have agreed to give Kastner a right of first refusal

in the film rights. Consequently, this contract counterclaim must fail.

Even if McClintick were the owner of the rights to the article, Kastner's contract claim would fail on vagueness grounds alone. It is well settled that for a contract to be valid the salient terms must be set forth in sufficient detail so that the parties' intention may be ascertained with a reasonable degree of certainty. *Candid Productions, Inc. v. Int'l Skating Union,* 530 F.Supp. 1330, 1333–34 (S.D.N.Y.1982). Even where the parties "believe that they are bound, if the terms of the agreement are so vague and indefinite that there is ... no means by which such terms may be made certain, then there is no enforceable contract." *Deligiannis v. Pepsi-Co, Inc.,* 757 F.Supp. 241, 256 (S.D.N.Y.1991) (citing *Candid Productions,* 530 F.Supp. at 1333–34). Therefore, where a contract does not have such essential terms as the time or manner of performance or price to be paid, the contract is unenforceable. *Id.*

In the instant case, deposition testimony establishes that the February 1996 agreement consisted of McClintick stating that "he had a good relationship with the senior editor [at *Fortune* ] and that he was confident that [McClintick and Kastner] could work the movie project out." Wolf Aff. Ex. 1 at 88–89. Furthermore, McClintick's deposition testimony reflects his belief that after this conversation he had obligated himself to giving Kastner the "pole position" *i.e.,* if someone bid on the film rights to the article, Kastner would have the opportunity to top that offer.[3] Material terms, however, such as the timing or manner by which McClintick would secure Kastner's right of first refusal from *Fortune* are missing, to say nothing of the fact that he did not have any rights to negotiate away. *See Pinnacle Books, Inc. v. Harlequin Enterprises, Ltd.,* 519 F.Supp. 118, 122 (S.D.N.Y.1981) (contract held unenforceable where parties agreed to use "best efforts" but failed to establish express standards to measure that performance); *cf. De Laurentiis v. Cinematografica De Las Americas, S.A.,* 9 N.Y.2d 503, 215 N.Y.S.2d 60, 174 N.E.2d 736 (1961)

3. Kastner refers to this as the "right of first refusal."

(enforcing a written contract where the parties agreed to make a good faith effort to create a story outline "acceptable to both"). Indeed, McClintick's promise appears to be little more than a promise to "take care of [Kastner]" or perhaps putting in a good word when dealing with *Fortune* executives. *See Deligiannis*, 757 F.Supp. at 257. While there may be more here than meets the eye, the law seems clear that such a promise is insufficient to create an enforceable contract. *Id.* at 256–57. Consequently, because the February 1996 agreement is unenforceable, Kastner's cause of action for breach of that agreement must fail.

### III. *Conclusion*

For the reasons stated above, plaintiffs' motion for summary judgment with respect to defendants' first and second counterclaim for breach of contract is GRANTED. The parties should be prepared to try the remainder of the claims [4] on August 25, 1997 at 9:30 a.m. in Courtroom 23B.

**SO ORDERED.**

---

4. The claims that remain are as follows: plaintiffs' claim for interference with prospective contractual relations and defendants' counterclaim for quantum meruit.