Aristomenis **DELIGIANNIS, Niki Deligiannis, Robert A. Deligiannis and Constantine A. Deligiannis, Plaintiffs,**

v.

**PEPSICO, INC., a North Carolina corporation, Pepsi–Cola Metropolitan Bottling Company, Inc., a New Jersey corporation, Defendants.**

No. 88 Civ. 6243 (SWK).

United States District Court,
S.D. New York.

Jan. 29, 1991.

Kaye, Scholer, Fierman Hays & Handler, New York City by Fred A. Freund, Richard M. Steuer, Sally J. Forman and David I. Lewittes, for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiffs bring this diversity action to recover damages in excess of $92 million arising out of an alleged contract with defendants concerning the purchase and sale of certain bottling companies and bottling licenses. In May 1989, the Court dismissed the antitrust claims and all claims asserted by Deep South Pepsi–Cola Bottling Company, for failure to state a claim upon which relief could be granted in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants now move, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, for an order granting them summary judgment dismissing plaintiff's remaining claims.

## BACKGROUND [1]

PepsiCo, Inc. ("PepsiCo") is a manufacturer of soft drink concentrates. It owns a number of well-known trademarks, including "Pepsi–Cola," "Pepsi," "Diet Pepsi," "Slice" and "Mountain Dew." It licenses these trademarks to bottling companies across the United States to manufacture and distribute the trademarked soft drinks. Each bottling company has been granted an exclusive license to sell the trademarked products within a defined geographic territory.

Among the bottling companies licensed by PepsiCo in early 1985 were the Franklin Bottling Company ("Franklin"), headquartered in Franklin, Pennsylvania, and Buchanan Enterprises, Inc., headquartered in Texarkana, Arkansas. Franklin was owned by members of the Deligiannis family—the brothers Robert, Constantine and

Thompson, Hine and Flory, Akron, Ohio by Richard E. Guster, Kevin J. Breen, Dowdy, Kitchens, Whittington & Burkhalter, McComb, Miss. by Ronald L. Whittington, Vincent J. DeSalvo, Baton Rouge, La. and Boyle, Voegler & Haimes, New York City (Michael J. Levin, of counsel), for plaintiffs.

---

1. The relevant facts are taken from the parties' statements of undisputed material facts submitted pursuant to Rule 3(g) of the Civil Rules for the Southern District of New York. In accordance with Rule 3(g), all material facts set forth in defendants' statement not controverted by plaintiffs' have been deemed admitted. For purposes of this motion, the Court resolves all inferences concerning disputed issues of fact against the movants.

Michael Deligiannis, and their parents, Aristomenis and Niki Deligiannis—all of whom, with the exception of Michael, are plaintiffs in this action.

Buchanan Enterprises was owned by Sam Buchanan. Although it sold PepsiCo products, its largest sellers were Dr Pepper products, for which it held a license from PepsiCo's rival, the Dr Pepper Company. Buchanan Enterprises was licensed for three adjoining territories—Texarkana, Arkansas ("Texarkana"); Camden, Arkansas ("Camden"); and Mount Pleasant, Texas ("Mount Pleasant")—only two of which, Texarkana and Camden, were licensed for Pepsi. In addition, Buchanan Enterprises was licensed and produced 7–Up, Sunkist and Canada Dry soft drink products.

*The Deligiannises' Southern Acquisitions*

In 1983, the Deligiannis group was presented with an opportunity to acquire an independent Pepsi–Cola bottling company located in Natchez and McComb, Mississippi ("Natchez/McComb"). The Deligiannis group closed Natchez/McComb on June 17, 1983, paying $6.25 million.

In late 1984–early 1985, the members of the Deligiannis family began to consider the possibility of selling Franklin to PepsiCo, an idea the Deligiannis group had previously considered in 1981. (Deposition of Robert Deligiannis ["R. Deligiannis Tr."],[2] at 209–11; M. Deligiannis Tr. Vol. III at 12–14.) At about the same time, the Deligiannis group was presented the opportunity to acquire a PepsiCo-licensed bottling company in Jennings and Lake Charles, Louisiana ("Jennings/Lake Charles").

The Jennings/Lake Charles acquisition ultimately was closed for approximately $9 million on April 19, 1985 at which time the Deligiannis group assumed additional debt, bringing its bank indebtedness (exclusive of installment payment obligations to the sellers of the acquired companies) to $17.5 million.

While seeking financing to acquire the Jennings/Lake Charles bottling company, the Deligiannises learned that Buchanan Enterprises might also be for sale. In January 1985, Sam Buchanan told PepsiCo's Mr. Mangold that he might be interested in selling his business, but "[o]nly if there is an entrepreneur who can accommodate our entire house, meaning all of our brands." (Buchanan Tr. 10–11.) Mr. Mangold called Robert Deligiannis and let him know that the Texarkana bottling company might be for sale. (R. Deligiannis Tr. 543.) Robert Deligiannis testified that Mr. Mangold told him to call Mr. Buchanan directly:

> After Jim Mangold had talked with Sam Buchanan, Jim Mangold called me and told me to call Sam to set up a date because Jim thought it was fruitless for him to set the date up and then have to call me back and see if my schedule was right.

(R. Deligiannis Tr. 543.)

Robert Deligiannis subsequently contacted Mr. Buchanan and arranged to meet with him. The two met in Texarkana on February 12, 1985. At that time Mr. Buchanan offered to sell "the stock of Buchanan Enterprises" for total consideration of approximately $20 million. On April 8, 9 and 10, Robert Deligiannis again travelled to Texarkana, visited retail outlets in the area and met once more with Mr. Buchanan. Promptly thereafter he sent a letter, dated April 11, 1985, to Mr. Buchanan, offering to pay $18 million on certain terms. Mr. Buchanan responded by letter dated April 23, 1985, containing a counteroffer of $18,450,000 on different terms. (R. Deligiannis Ex. 23; R. Deligiannis Tr. 254; Buchanan Tr. 18; Buchanan Ex. 4.)[3] Throughout the negotiations there were repeated telephone calls between Mr. Deligiannis and Mr. Buchanan.

After providing the initial information to Buchanan concerning the Deligiannis

---

**2.** Unless otherwise indicated, excerpts from the transcripts of the various depositions to which reference is made herein are contained in defendants' Appendix of Excerpts from Deposition Transcripts, and shall be indicated by the notation "Tr."

**3.** Unless otherwise indicated, excerpts from exhibits marked at the various depositions to which reference is made herein are contained in defendants' Appendix of Excerpts from Deposition Exhibits, and shall be indicated by the notation "Ex."

group's interest, PepsiCo played no role in the Texarkana negotiations. (Buchanan Tr. 42–43.) Buchanan also testified that PepsiCo never pressured him not to sell to the Deligiannis group. (Buchanan Tr. 42–43.)

On June 6, 1985, according to Robert Deligiannis, Mr. Buchanan called to arrange a further meeting later that month because Mr. Deligiannis had been putting him off. Deligiannis also recalled Mr. Buchanan saying, "Bob, if you do not sign the letter of intent by the end of the month, then I am going to pull it [Buchanan Enterprises] off the market."

On or about June 18, 1985, Mr. Deligiannis again spoke with Mr. Buchanan over the telephone. During this conversation they discussed a further offer by Buchanan. Following this telephone call, Mr. Buchanan undertook to "write down what my final deal would be on paper, and send it to him." (Buchanan Tr. 27.) Buchanan's letter dated June 19, 1985, accompanied by a formal letter of intent, offered to sell the stock of Buchanan Enterprises for $18,536,-748 on still different terms. (R. Deligiannis Ex. 24; Buchanan Ex. 2.)[4]

According to Mr. Deligiannis, Mr. Buchanan called him on June 21, and said that the "sale was off because I was dragging my feet, I better sign the letter of intent by June 30th." (R. Deligiannis Tr. 587.) Deligiannis testified that he did not sign by June 30, however, because Jeff Cone of PepsiCo cautioned him not to:

[T]here was [a] telephone conversation between us, between Jeff and myself.

Q: What was the nature of the communication?

A: We discussed this letter of intent proposal and he had suggested to me that there was something that needed to be added or subtracted, that there was something that was not right, but I don't remember exactly.

. . . .

Jeff said, "You cannot sign it because Sam [Buchanan] has some things mixed up."

(R. Deligiannis Tr. 643–44.)

Mr. Deligiannis testified that at the time of this conversation, he "understood what Jeff was telling him" (R. Deligiannis Tr. 656), and that Cone sent him a handwritten note that set forth "the reason why we should not sign the letter of intent with Texarkana, for the acquisition of it." (R. Deligiannis Tr. 33: R. Deligiannis Ex. 27.) As Mr. Deligiannis understood the note, Mr. Cone was advising him that the assets to be retained by Mr. Buchanan "should have been deducted" from the purchase price rather than added to it. (R. Deligiannis Tr. 653.) Mr. Deligiannis agreed that this was sound advice and testified that he would not sign the letter of intent "if there was an error in it, I would not sign it the way it was." (R. Deligiannis Tr. 658–59.)

Mr. Deligiannis never brought the error to Mr. Buchanan's attention. Mr. Deligiannis testified that Mr. Buchanan called him again, on July 1, reaching him in Pittsburgh where he was attending the first of two closing meetings held in connection with the Deligiannises' sale of the Franklin Bottling Company. According to Deligiannis:

Sam called me up and . . . said if I didn't sign the letter of intent, that you could consider that I have taken Texarkana off the market.

(R. Deligiannis Tr. 675.) Mr. Deligiannis further testified that in response to his query as to whether or not Buchanan would place Buchanan Enterprises back on the market, Mr. Buchanan responded "Yes, call my [sic] the first of September...." (R. Deligiannis Tr. 684.) According to Mr. Deligiannis, Mr. Buchanan called him once again after July 1, on either July 10 or 11, to reiterate that because Deligiannis had failed to sign the letter of intent his company was being taken off the market. Deligi-

---

**4.** On the face of the Letter of Intent, it appears that Mr. Buchanan had mistakenly added to, instead of subtracted from, the purchase price the value of certain items he planned to keep. Had Buchanan not made this apparent arith- metic error, the purchase price would have been less than Mr. Buchanan's April 23 offer of $18,-450,000, and closer to Mr. Deligiannis' April 11 offer of $18 million.

246

annis testified, "I just asked him if he would reconsider and he said to me that 'You have dragged this thing on long enough. You have not in good faith kept this thing going and at this time it is off the market,' and that was it." (R. Deligiannis Tr. 689–90.) Mr. Deligiannis again did not advise Buchanan that he believed there was an error in the purchase price. Robert Deligiannis' brother Michael testified that at the time of, and prior to, the Franklin closing on or about July 15, 1985, it was his understanding that Buchanan had taken Texarkana off the market. (M. Deligiannis Tr. Vol. II at 209–10.)

Robert and Constantine Deligiannis both testified that, notwithstanding Mr. Buchanan's pronouncements, they believed that he would still sell to them at some future date and simply dismissed the possibility that he might not. (C. Deligiannis Tr. 330–31; R. Deligiannis Tr. 684–85.)

*Discussions With PepsiCo*

On March 28, 1985, while the Deligiannis group was in the process of acquiring the Jennings/Lake Charles bottling company, a meeting was held in Franklin, Pennsylvania, attended by the Deligiannis family, their accountant/consultant Henry Burkhalter, and three PepsiCo employees—James Mangold, Jeff Cone and Richard Westelman. Among the topics discussed at the meeting was the means for financing prospective acquisitions—including the possibility of raising cash by selling Franklin. (R. Deligiannis Tr. 222–23, 226–31; Burkhalter Tr. 16–17, 21–27, 30.)

At this meeting, PepsiCo is alleged to have entered into a binding contract with the Deligiannises to consummate one of two transactions: Either (a) the Deligiannis group would sell the Franklin Bottling Company to PepsiCo or to one of its subsidiaries, and PepsiCo would assist the Deligiannis group in arranging financing to enable them to acquire Buchanan Enterprises directly from Sam Buchanan or (b) PepsiCo would only acquire the business comprising the Texarkana territory of Buchanan Enterprises, and swap it for the Franklin Bottling Company, at which time the Deligiannis group would acquire the

business comprising Camden and Mount Pleasant directly from Buchanan. (R. Deligiannis Tr. 4, 6; C. Deligiannis Tr. 39–45; Burkhalter Tr. at 74–77; *see also* R. Deligiannis Ex. 26 at 29.)

Robert and Constantine Deligiannis and Mr. Burkhalter all testified that the contemplated "swap" was a firm deal, consummated during the discussions which took place at the March 28, 1985 meeting. The two other plaintiffs, however, had no such impression of a deal being struck. Niki Deligiannis, mother of Robert, Constantine and Michael, testified that no PepsiCo representative made any representation that the Deligiannis family would get Texarkana. (Deposition of Niki Deligiannis ["N. Deligiannis Tr."] at 154–55.) And Aristomenis Deligiannis, the father, did not remember any PepsiCo offer for Franklin at the March 28 meeting. (Deposition of Aristomenis Deligiannis ["A. Deligiannis Tr."] at 69–70.) Despite earlier testimony about how a "firm deal" had been struck, Mr. Burkhalter later testified that after the March 28 meeting, "[a] decision was to be made by the Deligiannis[es] whether they wanted to do it or not" (Burkhalter Tr. 30).

In May 1985, the Deligiannis group entertained a competing offer for the Franklin Bottling Company made by Santa Fe Associates. Santa Fe's offer was higher than PepsiCo's offer, but Robert Deligiannis, seeing a "bidding war" developing (R. Deligiannis Tr. 382), subsequently went back to PepsiCo's James Mangold, and PepsiCo responded by raising its offer. (C. Deligiannis Tr. 286–87; Mangold Tr. 109; M. Deligiannis Tr. Vol. II at 129.)

Constantine Deligiannis testified that the March 28 "agreement" with PepsiCo precluded dealings with Santa Fe. He testified that, despite the absence of any agreement with PepsiCo on financial terms, he could not have accepted the Santa Fe offer by virtue of a prior "commitment" to PepsiCo. (C. Deligiannis Tr. 206, 216–17.) His brother, Robert, in contrast, maintained that he and PepsiCo only had a "proposed deal" at that time. Robert Deligiannis testified:

Q. Did you understand before you went back to Mr. Mangold that you and PepsiCo had a deal?

A. We had a proposed deal.

(R. Deligiannis Tr. 322–23.) Plaintiff Aristomenis felt free to accept the Santa Fe offer despite the "promises" that had gone before:

Q. Did you regard yourself as free to accept the Santa Fe offer if PepsiCo had not met it or bettered it?

A. Yes.

Q. Were there any promises between you and PepsiCo before the Santa Fe offer regarding Franklin and Texarkana?

A. I believe so, yes.

(A. Deligiannis Tr. 64–65.) Plaintiff Niki testified:

Q. At the time of this meeting with your family, in connection with the Santa Fe offer, did you have a point of view, whether you expressed it or not, that you could not accept the Santa Fe offer because you had a binding contract which you had made previously with PepsiCo concerning Franklin and Texarkana?

A. It wasn't really a binding contract we had with them to my point of view.

(N. Deligiannis Tr. 131.) And Michael Deligiannis, a non-party witness, testified:

Q. Am I correct that at the time you were considering a bid from Santa Fe, you had not made a binding commitment with regards to the sale of Franklin to PepsiCo?

A. To my knowledge that's true. We did not make a—or, we did not receive a bid from Santa Fe when there is a binding commitment to PepsiCo.

Q. In other words, you were free to— you felt free to accept a Santa Fe bid, presuming it was otherwise satisfactory to you; is that correct?

A. Correct.

. . . .

Q. You now had a higher bid from Santa Fe than the Pepsi bid, what was your position on the matter?

A. The only position I can see it would be would be to let Pepsi–Cola

know and see if they had an interest in pursuing the franchise further.

(M. Deligiannis Tr. Vol. I at 102, Vol. II at 128.)

The testimony of Robert Deligiannis is to the same effect: On April 30, 1985, one month after the March 28, meeting, Mr. Mangold inquired whether the Deligiannis group was prepared to proceed with the sale of Franklin, and "I said that we would let him know in a short period of time, but we could not give him an answer at that particular time." (R. Deligiannis Tr. 294.)

The parties do not dispute that through May 24, 1985, no agreement concerning Franklin or Texarkana had been put in writing. On May 24 PepsiCo submitted a written offer to acquire the stock of Franklin Bottling Company in response to the Santa Fe bid. That offer contained no reference to the Texarkana bottling company. After certain revisions, the Deligiannis group signed the preliminary agreement as of May 29, 1985—which still contained no reference to Texarkana.

The record indicates no other writing in which PepsiCo promised to sell Texarkana to the Deligiannis group, to "get" Texarkana for the Deligiannis group or somehow to separate out the Texarkana part of Buchanan Enterprises and sell it or get it for the Deligiannis group. Although plaintiffs claim to have specifically demanded such a writing, none was provided. The Deligiannises decided to proceed without one, despite advice from their attorneys and accountants that they should not proceed with the sale of the Franklin Bottling Company without securing such a writing from PepsiCo. Robert Deligiannis testified that he "was told by counsel that we should get this thing in writing because we are dealing with a very risky situation." (R. Deligiannis Tr. 15.) According to Robert Deligiannis, PepsiCo, through Mr. Mangold, stated that "there is no way that they could put in writing the deal with Texarkana." (R. Deligiannis Tr. 7.) Mr. Deligiannis further testified:

Jim Mangold told me that there was no way that he could put in writing to guarantee that Texarkana acquisition because

it would be an antitrust violation because they did not own the Texarkana franchise at that time.

(R. Deligiannis Tr. 12; *see also id.* at 18; N. Deligiannis Tr. 87–96.)

Plaintiffs concede that the Dr Pepper Company's approval of licenses for Dr Pepper in the Buchanan Enterprises territories was an indispensable condition of Texarkana's acquisition since Texarkana would not have been a "viable" investment without the licenses. Without Dr Pepper's approval "[t]he deal would not have closed." (R. Deligiannis Tr. 565.) Yet there was no certainty that the Deligiannis group would receive these licenses, particularly since the Dr Pepper company was pursuing a policy at that time of granting licenses to Coca-Cola bottlers whenever practical (C. Deligiannis Tr. 236–37; Affidavit of Donald L. Antle, sworn to on November 20, 1989 ["Antle Aff."], at ¶ 4). The Deligiannis group never submitted to Dr Pepper a formal proposal for the acquisition of such licenses. (Antle Aff. at ¶ 6–7.)

*The Franklin Closing*

On July 15, 1985, the Deligiannises signed a Stock Purchase Agreement for the sale of the Franklin Bottling Company which contained no representations or promises concerning the Texarkana bottling company. The Stock Purchase Agreement did contain a formal integration clause, section 6.4, entitled "Entire Agreement":

This agreement, together with all the Schedules hereto and the documents and instruments being delivered in connection herewith, contains the entire understanding of the parties hereto with respect to the transactions contemplated hereby and may be amended, modified, supplemented or altered only by a writing duly executed by all of the parties hereto, and any prior agreements or understandings, whether oral or written, are entirely superseded hereby.

(R. Deligiannis Ex. 14 [tab 3].) Plaintiffs were at all times represented by counsel, who are asserted to have known of plaintiffs' contentions concerning Texarkana and to have advised plaintiffs to obtain a written commitment for Texarkana in connection with closing the sale of Franklin.

Just prior to the July 15, 1985 Franklin closing, plaintiffs transferred the stock of Natchez/McComb and Jennings/Lake Charles, together with their liabilities, to their newly formed corporation, Deep South. At the closing, plaintiffs received from PepsiCo the following cash payments, out of which they paid certain amounts to reduce the outstanding debt to Mellon Bank which had arisen out of their earlier Natchez/McComb and Jennings/Lake Charles acquisitions:

| Plaintiff Deligiannis | Stock Sale Proceeds | Payment to Mellon Bank |
|---|---|---|
| Aristomenis | $1,573,206 | $1,045,000 |
| Niki | 2,768,046 | 1,795,000 |
| Robert | 1,871,916 | 1,480,000 |
| Constantine | 1,871,916 | 1,480,000 |
| | $8,085,084 | $5,800,000 |

(R. Deligiannis Ex. 17.) Although the $5,800,00 Mellon Bank repayments were reflected on the Deep South books as loans and equity contributions to Deep South, none of the money actually went to Deep South but instead was used to pay down the Mellon Bank debt, which the Deligiannises had personally guaranteed.

Michael Deligiannis received approximately $1,871,916 at the Franklin closing but decided to leave his family's soft drink business and not participate in the family's ownership of Natchez/McComb and Jennings/Lake Charles as transferred to Deep South. Michael determined that in surrendering his interest in the continuing opera-

tions he would be entitled to no additional compensation from his family members since his share of the Franklin closing proceeds more than compensated him for his interest in the family's enterprise, including the operations that the plaintiff family members were continuing. (M. Deligiannis Tr. Vol. II at 190–93.) Plaintiffs agreed with his assessment. (R. Deligiannis Tr. 855–56; N. Deligiannis Tr. 132.)

At the time of the Franklin closing, Mellon Bank entered into a Restructuring Agreement with plaintiffs, restructuring the debt owed by the Deligiannis companies. Affidavit of Edward A. Bittner, Jr., sworn to on July 25, 1990 ("Bittner Aff."), Ex. 48.[5] In connection with that restructuring, Mellon Bank required plaintiffs to compile various reports disclosing their existing obligations and forward commitments. The papers submitted disclosed no forward commitments or material obligations incurred since July 31, 1984 except those assumed in connection with the prior acquisition of Jennings/Lake Charles in April 1985. Affidavit of Nancy J. Shurlow, sworn to on July 24, 1990 ("Shurlow Aff.") Ex. 1, ¶¶ 3.12, 6.05, Ex. 18; Bittner Aff. Ex. 64.)

In November 1985 at the meeting of the National Soft Drink Association in Anaheim, California, Sam Buchanan spoke with Al Burke of Mid–South Bottling Company, another PepsiCo licensed bottler with territories adjacent to those of Mr. Buchanan. Burke soon thereafter visited Buchanan in Texarkana and within two weeks had negotiated the sale of Buchanan Enterprises to Mid–South for approximately $21 million. Mr. Buchanan testified:

> [W]hen I arrive at something I think is fair, then it seems to me, like the guy on the other side of the table says yes or no, and we go on and remain friends. Burke was in a position to respond ... and he did respond, and he met my deal, and we signed off, it's that simple.

(Buchanan Tr. 40.) In describing PepsiCo's role in the transaction, Mr. Buchanan testified as follows:

> Q. Did PEPSICO participate in your negotiations with Mr. Burke?
> A. No, other than, I asked Mangold on the phone, when, I don't know, probably after Anaheim, if Al [Burke] would be approvable in his opinion. And, he said, "yeah, Al or Bob."
> Q. Did you understand that to mean Bob Deligiannis?
> A. Yeah.
> Q. Did anyone from PEPSICO ever pressure you to sell to Mr. Burke's group?
> A. No one from Pepsi ever pressured me to do anything, except sell more Pepsi.

(Buchanan Tr. 45.)

In or about December 1985, Robert Deligiannis learned that Mr. Buchanan had reached an agreement with Mid–South. He subsequently asked PepsiCo to reject Mid–South as a licensee for the Buchanan Enterprises territories, so that Buchanan would be forced to sell to the Deligiannises instead. (R. Deligiannis Tr. 755.) PepsiCo refused. (Mangold Tr. 163–70.) Soon after, Mid–South closed on the acquisition of Buchanan Enterprises and was issued PepsiCo licenses for Texarkana and Camden, the two PepsiCo territories which had been served by Buchanan Enterprises.

*The Contemplated Sale of Deep South*

By late 1986, despite an earlier report to their bankers stating that Deep South's Natchez/McComb operation had exhibited a positive growth trend, that Jennings/Lake Charles indicated a great potential for growth and that there was "good potential" for Deep South's "financial condition to improve considerably over the next several years," the Deligiannis family, behind in their commitments to Mellon Bank, decided to offer Deep South for sale at the asking price of $21 million. By January 1987, the Deligiannises had received offers for almost that amount: an

---

**5.** The affidavits of Nancy J. Shurlow and Edward A. Bittner together with the exhibits annexed thereto are contained in defendants' Appendix of Exhibits, as Exhibits "F" and "G" respectively.

offer of $20.5 million for both Natchez/McComb and Jennings/Lake Charles from Mid–South, and a combined offer of $19.5 million—$10.5 million for Natchez/McComb from the Brown group, and about $9 million for Jennings/Lake Charles from the Gantz group. The Deligiannises rejected these and other offers and continued to run their business.

During January through April 1987, plaintiffs took Deep South off the market while pursuing financing in the hope of keeping Deep South. In April 1987, unable to raise more money, the Deligiannises renewed the bidding process for Deep South but rejected successive renewed offers from the Brown and Gantz groups. Ultimately, Deep South was forced into bankruptcy and was sold to the Brown group during the course of the bankruptcy proceedings.

*Procedural History*

On December 9, 1987, Deep South and the four individual plaintiffs, the brothers Robert and Constantine Deligiannis, and their parents, Aristomenis and Niki Deligiannis, commenced this action in the United States District Court for the Western District of Pennsylvania. The defendants originally were PepsiCo, Metro and James Mangold, who then was employed by Pepsi-Co. The complaint alleged antitrust violations, breach of contract and fraudulent misrepresentation.[6]

Defendants moved to transfer the case to the Southern District of New York pursuant to 28 U.S.C. § 1404(a), and moved for an order dismissing the complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Mr. Mangold filed a separate motion to dismiss. On June 16, 1988, the Court (Mencer, J.) granted Mangold's motion to dismiss and transferred the rest of the case to the Southern District of New York. *See Deep South Pepsi–Cola Bottling Co., Inc. v. PepsiCo, Inc.*, No. 87–346, slip op. (W.D.Pa. June 16, 1988). In December

1988, plaintiffs moved to transfer the case again, this time to Mississippi.

This Court denied both motions. *See Deep South Pepsi–Cola Bottling Co., Inc. v. PepsiCo, Inc.*, 88 Civ. 6243, slip op., 1989 WL 48400, 1989 U.S.Dist. LEXIS 4639 (S.D. N.Y. May 2, 1989) (Leisure, J.) (hereinafter "Opinion"). The Court dismissed the corporation, Deep South, as a plaintiff and dismissed the antitrust claims. The Court also denied plaintiffs' motion to re-transfer the case. The Court concluded that the two remaining claims, for breach of contract and fraudulent misrepresentation, could not be dismissed on a 12(b)(6) motion, without any discovery, because one could hypothesize a set of facts under which the complaint might set forth a claim upon which relief could be granted. Opinion at 22–24.

DISCUSSION

I. Summary Judgment Standard

The parties have completed discovery and defendants now move for an order, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, granting them summary judgment dismissing all claims against them.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir.1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90

---

**6.** The complaint also contains claims for rescission (Count IV) and constructive trust (Count V). In the context of this action, the Court deems these claims incidental to, and

contingent upon, the substantive contract and fraud claims, respectively, and essentially remedial in nature.

S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).[7] The non-moving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact. To avoid summary judgment, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (interpreting the "genuineness" requirement). For the reasons set forth below, defendants' motion for summary judgment should be granted and the complaint's remaining claims dismissed.

## II. Plaintiffs' Contract and Fraud Claims

### A. *The Parol Evidence Rule*

The undisputed facts establish that plaintiffs' contract claim, alleging defendants' breach of a purported oral agreement to "get" them Texarkana, is barred by the parol evidence rule. The parol evidence rule "was developed to safeguard the sanctity of integrated writings from future attempts at contradiction," *United States v. Wallace & Wallace Fuel Oil Co.*, 540 F.Supp. 419, 425 (S.D.N.Y.1982) (citations omitted), and serves "to permit a party to a written contract to protect himself against 'perjury, infirmity of memory or the death

of witnesses.'" *Fogelson v. Rackfay Const. Co.*, 300 N.Y. 334, 338, 90 N.E.2d 881, 882 (1950) (quoting *Mitchill v. Lath*, 247 N.Y. 377, 160 N.E. 646 (1928). The parol evidence rule provides that:

> [w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.

3 A. Corbin, *Contracts* § 573, at 357 (1960). On defendants' motion to dismiss, however, the Court declined to dismiss on the basis of the parol evidence rule without discovery, observing that "there are two exceptions to the parol evidence rule that are potentially applicable." *Id.* One possibility was that "plaintiffs may demonstrate that the scope of the written agreement, and integration clause, did not include the agreement concerning Texarkana," but rather "was collateral to the written agreement." *Id.* Another was that "plaintiffs could show fraud in the inducement, despite the integration clause." *Id.* Now that discovery is complete, it is clear that as a matter of law, plaintiffs have adduced no facts tending to establish either of these possible exceptions to the parol evidence rule.

### 1. *The Texarkana and Franklin Agreements*

■ The deposition testimony establishes that plaintiffs uniformly have insisted that the agreement for Franklin, at every stage, was inextricably linked to Texarkana, and that Texarkana was an essential element of the Franklin transaction. Robert Deligiannis testified that "[t]he essential terms of the contract [for Franklin] were that if we did not get the Texarkana

---

7. The moving party may rely on the evidence in the record to point out the absence of genuine issues of material fact. *Celotex, supra*, 477 U.S. at 323, 106 S.Ct. at 2552. The moving party does not have the burden of providing evidence to negate the non-moving party's claims. *Id.* As the Supreme Court recently noted, "whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

franchise, we were not going to sell the Franklin franchise to the Pepsi–Cola Company." (R. Deligiannis Tr. 4–5.) Constantine Deligiannis testified that "[t]he terms of the contract that I agreed to was that we would sell them Franklin for consideration for Texarkana." (C. Deligiannis Tr. 41.) Constantine further testified:

> Q. It is your contention, am I correct, and your understanding, that the two transactions were linked, that is, you would not have sold Franklin but for the alleged promise of PepsiCo that you would get Texarkana; is that correct?
> A. That's right, yes, sir.

(C. Deligiannis Tr. 50; *see also* R. Deligiannis Tr. 383, 524; Burkhalter Tr. 40–42.) Plaintiffs' unequivocal version of the facts is that the only transaction they contemplated was one in which getting Texarkana was the *sine qua non* for selling Franklin. The "collateral agreement" exception to the parol evidence rule thus has no application.

In a clumsy and ultimately futile attempt to bring their case within the "collateral agreement" exception, plaintiffs assert a new version of the alleged oral contract in direct contrast to that given during their depositions. Plaintiffs now argue that the sale of Franklin was not consideration for Texarkana but rather that:

> if the Deligiannis group sold Franklin to Metro, then PepsiCo would permit the Texarkana trademark license to be transferred only to plaintiffs....
> PepsiCo promised that it would not approve the transfer of the Texarkana license to anyone but plaintiffs....
>
> . . . . .
>
> PepsiCo represented to plaintiffs that it would not approve the transfer of the Texarkana franchise to anyone but them.

Plaintiffs' Memorandum ("Pl. Mem.") at 19, 24. This latest version of the alleged oral agreement, one in a series of versions that plaintiffs have proffered during the course of this litigation, is utterly unsupported by probative evidentiary facts.

Plaintiffs' competing versions of the facts (*see* Pl.Mem. at 19–24; Supplemental Affidavit of Robert Deligiannis, ¶ 9), in stark contrast to their clear and uncontroverted deposition testimony concerning the nature and content of the alleged oral agreement, fails as a matter of law to create a genuine issue of fact. *See Mack v. United States*, 814 F.2d 120 (2d Cir.1987); *Miller v. International Tel. & Tel. Corp.*, 755 F.2d 20 (2d Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985). This Court will not suffer plaintiffs' attempt to create issues of fact through their own proffer of materially different versions of the facts.[8]

 Moreover, accepting plaintiffs' new version of the facts as true, plaintiffs still fail to establish even a colorably enforceable contract. The agreement plaintiffs now urge, a "separate and distinct" promise that PepsiCo "would not approve the transfer of the Texarkana [trademark] license to anyone but plaintiffs" (Pl.Mem. at 14, 19), would have required PepsiCo to refuse to license any purchaser of Buchanan Enterprises other than plaintiffs, whether that other purchaser were qualified or not. Its effect would have been to force Buchanan to sell to plaintiffs, or not sell at all. Such a promise—even if it were not directly contrary to the record—could not provide the basis for a valid claim for two reasons. First, such a contract would be lacking in consideration; and second, it would have been illegal.

Plaintiffs testified without contradiction that Franklin was consideration for Texarkana and that the two were linked. Plaintiffs now deny that one was consideration for the other. If as they now claim, the two were separate, then there would have been no consideration for the alleged promise to exclude all others for the Texarkana licenses. The promise is therefore unenforceable as a matter of law. *Shields v. Hoffman*, 416 Pa. 48, 204 A.2d 436 (1964) (consideration cannot be borrowed from a "separate and distinct" agreement); *Di Sante v. Russ Financial Co.*, 251 Pa.Su-

---

**8.** In actuality, it is apparently plaintiffs' counsel who evidently see fit to offer competing versions of the facts, at odds with plaintiffs' own essentially unvarying testimony concerning the nature and substance of the alleged oral agreement.

per. 184, 380 A.2d 439 (1977) (legally enforceable contract requires that each contracting party supply consideration to other).[9]

Such agreement would have been unenforceable in any event because it would have been illegal. Plaintiffs' alleged agreement would require PepsiCo to deny Mid–South a license—even though it was an existing qualified PepsiCo licensee for territories surrounding Texarkana—and force Buchanan to sell to plaintiffs for whatever he could get. The alleged agreement is patently unenforceable because its performance would have worked a fraud on Buchanan. *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 199 N.Y.S.2d 483, 166 N.E.2d 494 (1960) (even if contract entirely legal, public policy will deny its enforcement if its performance would practice fraud on third party); *Cherry Press, Inc. v. Redevelopment Auth. of Philadelphia*, 11 Pa.Cmwlth. 47, 312 A.2d 477 (1973) (court will not enforce agreement that would work fraud on third party).

### 2. *The Fraudulent Inducement Exception to the Parol Evidence Rule*

■ On the motion to dismiss, the Court also held open the possibility that plaintiffs could bring themselves within a second exception to the parol evidence rule if they "could show fraud in the inducement, despite the integration clause." (Opinion at 24 n. 6.) In order to establish fraud, including both fraud in the inducement and fraudulent misrepresentation, a party must establish:

(1) a misrepresentation of fact, (2) fraudulently uttered, (3) with intent to induce reliance, (4) inducing justifiable reliance, (5) resulting in injury.

*Averbach v. Rival Mfg. Co.*, 809 F.2d 1016, 1019 (3d Cir.), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3187, 96 L.Ed.2d 675 (1987). Where a party opposes a motion for summary judgment by attempting to establish fraud, that party must present "clear and convincing evidence" of the requisite elements of fraud and may rely neither on conclusory allegations nor speculation. *Lester v. Pickwick Int'l, Inc.*, 528 F.Supp. 1011, 1013 (E.D.N.Y.1981); *see also Federal Deposit Ins. Corp. v. Borne*, 599 F.Supp. 891 (E.D.N.Y.1984). Plaintiffs here have failed to establish the requisite elements of either fraudulent inducement or fraudulent misrepresentation and thus cannot avoid the application of the parol evidence rule to bar proof of the purported oral agreement concerning Texarkana.

### a. *Basis of plaintiffs' fraud claim*

For the "fraud in the inducement" exception to frustrate the application of the parol evidence rule, "the fraud involved must consist of representations of presently existing material fact." *See, e.g., First Pennsylvania Bank N.A. v. Weber*, 240 Pa.Super. 593, 360 A.2d 715 (1976). "A promise to do something in the future, which promise is not kept, is not fraud, however, because it is not a misrepresentation of fact." *First Pennsylvania Banking & Trust Co. v. McNally*, 200 Pa.Super. 196, 188 A.2d 851 (1963). Similarly "[a] broken promise to do or refrain from doing something in the future ... is not accounted 'fraud of the kind that will admit parol testimony to vary the terms of a written contract.'" *Sokoloff v. Strick*, 404 Pa. 343, 348, 172 A.2d 302, 304 (1961) (citation omitted).

■ New York law is to the same effect, precluding a cause of action for fraud based solely upon failure to perform contractual promises of future acts. *Lanzi v. Brooks*, 54 A.D.2d 1057, 388 N.Y.S.2d 946

---

**9.** Paragraph 6.8 of the Franklin Stock Purchase Agreement is a choice of law clause providing that the substantive law of the Commonwealth of Pennsylvania shall govern the construction of such agreement. As the Court noted in connection with defendants' motion to dismiss, "Pennsylvania, New York Texas, Arkansas and Mississippi all have an interest in the instant litigation. Although the parties do not concede that Pennsylvania law would apply ... [n]o conflict between the laws of the interested states has been demonstrated." Opinion at 20 n. 3. The Court went on to apply Pennsylvania law. *Id.* On this motion, the parties again raise no choice of law issue and rely upon both Pennsylvania and New York law. Since there are no apparent conflicts in the law of those jurisdictions applicable to the claims raised here, the Court shall proceed similarly. *See Lehman v. Dow Jones & Co.*, 783 F.2d 285 (2d Cir.1986).

(3d Dept.1976), *aff'd*, 43 N.Y.2d 778, 402 N.Y.S.2d 384, 373 N.E.2d 278 (1977); *Kadish Pharmacy, Inc. v. Blue Cross and Blue Shield of Greater New York, Inc.*, 114 A.D.2d 439, 494 N.Y.S.2d 354, 355–56 (2d Dept.1985), *appeal dismissed*, 68 N.Y.2d 641, 505 N.Y.S.2d 72, 496 N.E.2d 231 (1986); *Tesoro Petroleum Corp. v. Holborn Oil Co.*, 108 A.D.2d 607, 607, 484 N.Y.S.2d 834, 835 (1st Dept.1985). Thus, a claim of fraudulent inducement cannot be based solely upon the failure to perform the promises that served as consideration for the contract itself. *Cranston Print Works Co. v. Brockmann Int'l A.G.*, 521 F.Supp. 609, 614 (S.D.N.Y.1981); *Trusthouse Forte (Garden City) Management, Inc. v. Garden City Hotel, Inc.*, 106 A.D.2d 271, 483 N.Y.S.2d 216 (1st Dept.1984).

Here, the alleged promise to "get" plaintiffs Texarkana is asserted to have been the very consideration for plaintiffs' sale of Franklin. As Constantine Deligiannis emphasized, "we would sell them Franklin for consideration for Texarkana." (C. Deligiannis Tr. 41; *accord id.* at 50; R. Deligiannis Tr. 383, 524.) Because plaintiffs' fraud claim is that PepsiCo orally promised them Texarkana and did not fulfill that promise, which is purported to be the very consideration given in exchange for plaintiffs' promise to sell Franklin to PepsiCo, plaintiffs cannot establish fraudulent inducement. *Cranston Print Works Co.*, 521 F.Supp. at 614; *Tesoro Petroleum Corp.*, 484 N.Y.S.2d at 835. Plaintiffs' fraudulent misrepresentation claim similarly fails.

### b. *Proof of fraudulent intent*

Plaintiffs' inability to establish the fraudulent inducement exception is confirmed by their failure to adduce evidence of fraudulent intent. It is well-settled that a purely conclusory allegation that defendants never intended to perform, standing alone, cannot convert a claim for breach of contract into one for fraudulent inducement to contract. *Hotel Constructors, Inc. v. Seagrave Corp.*, 574 F.Supp. 384 (S.D.N.Y. 1983). Similarly, "fraudulent intent not to perform a promise cannot be inferred merely from the fact of nonperformance."

*Brown v. Lockwood*, 76 A.D.2d 721, 733, 432 N.Y.S.2d 186, 195 (2d Dept.1980).

Plaintiffs have offered no evidence that PepsiCo intended not to fulfill the alleged promise to "get" plaintiffs Texarkana at the time the promise was allegedly made. Robert Deligiannis, for example, asserted only "that whenever somebody promises you something and does not carry forward with it ... that is fraud." (R. Deligiannis Tr. 7.) Constantine Deligianniss likewise based his fraud claim solely upon the allegation that PepsiCo failed to fulfill its alleged promise. (C. Deligiannis Tr. 62–62, 89–90.) Plaintiffs, moreover, offered no evidence that PepsiCo's alleged change in policy occurred at the time of the alleged contract rather than after the sale of Franklin. There is thus no proof of exactly what defendants' intention was at the time of the alleged oral promise. Plaintiffs' testimony, amounting to nothing more than allegations of non-performance, fails to raise a genuine issue of fact. *See Perma Research and Dev. Co. v. Singer Co.*, 410 F.Supp. 572, 578 (2d Cir.1969).

### c. *Justifiable reliance*

Plaintiffs have failed to adduce evidence of either a misrepresentation of an existing fact or fraudulent intent. Even if they had, however, the uncontroverted facts establish that their reliance upon any such supposed misrepresentation was, as a matter of law, unreasonable. Plaintiffs concede that Sam Buchanan informed them on July 1 and again on either July 8 or 11, prior to their sale of Franklin to PepsiCo on July 15, 1985, that any deal for Texarkana was off. (R. Deligiannis Tr. 686–90.) Plaintiffs thus could not have justifiably relied on any alleged representation by PepsiCo that plaintiffs would "get" Texarkana if they sold Franklin to PepsiCo; by the time of the Franklin closing, it was clear that Mr. Buchanan had taken Texarkana off the market and, in unambiguous terms, informed plaintiffs of that fact. Plaintiffs decided to go ahead with the sale of Franklin anyway without having considered the prospect that Buchanan might not later sell to them. (C. Deligiannis Tr. 330–31; R. Deligiannis Tr. 684–85.) Thus,

as of July 15, 1985 when Franklin was sold, there were no justifiable grounds for believing that Texarkana would be available for purchase in the future. Plaintiffs could not justifiably assume that Buchanan would eventually resume negotiations with plaintiffs—whom he had accused of not acting in good faith—and would reach an agreement with them. Once the Texarkana deal was off, any alleged PepsiCo promise, as of March or April 1985, that the Deligiannis group would "get" Texarkana could not provide the basis for a fraudulent inducement or fraudulent misrepresentation claim against defendants.

Plaintiffs' own assertion that PepsiCo refused to give a written guaranty of the alleged Texarkana deal confirms the impossibility of justifiable reliance. According to plaintiffs, they requested PepsiCo to put in writing its purported promise to "get" them Texarkana but were unsuccessful. James Mangold, they say, told them on July 1, 1985 that PepsiCo did not own the Texarkana bottling company and PepsiCo therefore could not give any guaranties as to who would succeed in purchasing it: "Jim Mangold told me there was no way that he could put in writing to guarantee that Texarkana acquisition because ... they did not own the Texarkana franchise at that time." (R. Deligiannis Tr. 12.) Plaintiffs, moreover, maintain that Mangold told them that it would be an antitrust violation for PepsiCo to guarantee Texarkana, and did not disagree with Mangold's assessment. (R. Deligiannis Tr. 207–08.) If as plaintiffs admit, Mangold expressly told plaintiffs that he could not guarantee the Texarkana acquisition in writing, and if plaintiffs were in accord that such a guarantee would be unenforceable under the antitrust laws, plaintiffs could not have justifiably relied on an alleged oral promise to "get" them Texarkana.

The Court rejects plaintiffs' argument that since they now are alleging that the sale of Franklin and the acquisition of Texarkana "involved two separate and distinct transactions," the integration clause in the Franklin agreement encompasses no agreement concerning Texarkana and the parol evidence rule does not apply. As set forth above, if the transactions were separate and distinct as plaintiffs now argue, there was no consideration for the alleged Texarkana agreement and plaintiffs' fraud claims fail on that ground alone.

Plaintiffs' contention that the testimony of Mr. Mangold confirms plaintiffs' current theory of distinct transactions, relies upon nothing less than a distortion of his testimony, quoting it out of context. Mr. Mangold's remark that Texarkana and Franklin were separate transactions (see Mangold Tr. 52–53), came in the context of his testimony concerning the very first discussion of Texarkana and Franklin in January 1985. Plaintiffs do not contend that any promises were made at that time. Moreover, there is no question that Mangold's reference to the Texarkana transaction in the testimony quoted by plaintiffs, was to the proposed transaction between *Mr. Buchanan and the Deligiannis group*, not the alleged agreement between PepsiCo and the Deligiannis group. The very question posed to Mr. Mangold inquired about "Mr. Buchanan selling ... Texarkana" on the one hand and about "the sale of Franklin to the Pepsi–Cola Company" on the other. (Mangold Tr. 5.) Whichever version of the alleged agreement plaintiffs assert, it is clear that Mangold flatly denied that any promises were made to plaintiffs concerning Texarkana. (Mangold Tr. 107, 126, 135, 257.)

■ The Court also rejects plaintiffs' argument that the integration clause in the Franklin Agreement does not preclude the proffer of parol or other extrinsic evidence against PepsiCo because PepsiCo is not a party to the Franklin Agreement. Plaintiffs' argument overlooks two critical facts. First, PepsiCo is Metro's parent and sole shareholder, and all negotiations alleged in this case were conducted by the same company representative, Mr. Mangold, who negotiated and signed the Franklin Agreement on behalf of Metro, and who is alleged to have made the oral agreement concerning Texarkana. It is undisputed that Mr. Mangold was a PepsiCo employee.

Second, nothing in the record supports plaintiffs' new distinction between Metro and PepsiCo. From the complaint onward, plaintiffs have contended that the alleged Texarkana promises were made by both Metro and PepsiCo, as were the Franklin promises. The complaint itself alleges that "*PepsiCo* ... acquired Franklin from the Deligiannis family" (Complaint ¶ 41, emphasis added), and repeatedly refers to "PepsiCo" as the entity making that acquisition. (*Id.*, ¶¶ 17, 19, 24.) The complaint asserts that *all* defendants were party to the Franklin agreement, claiming a contract "between plaintiffs and defendants for the sale and transfer of the Franklin bottling operation to defendants," (*Id.*, ¶ 48), and plaintiffs' extensive deposition testimony is to the same effect. (*See* R. Deligiannis Tr. 5, 180 ["The sale of Franklin to *PepsiCo* was only if we got Texarkana"] [emphasis added], 188, 226, 259; C. Deligiannis Tr. 41, 42, 216, 353.) The record simply does not support the distinction between PepsiCo and Metro which plaintiffs have attempted to draw at this late stage of the litigation. The Court is mindful of the axiomatic general rule that a contract in terms and in name with one corporation will not be treated as that of a parent or subsidiary. *See* 1 W. Fletcher Cyclopedia Corporations § 43 (Perm.Ed. 1990). This general rule, however, is not absolute and courts have departed from it under circumstances similar to those presented here. *See, e.g., National Homes Corp. v. Lester Industries, Inc.*, 404 F.2d 225, (4th Cir.1968), *aff'd after remand*, 425 F.2d 1210 (4th Cir.1970) (per curiam) (parent corporation entitled to benefit of contract entered into by subsidiary).

The factors discussed above, clearly establish plaintiffs' unwavering treatment of PepsiCo and Metro as functionally identical for purposes of both the Franklin sale and alleged Texarkana agreement. Plaintiffs are therefore estopped from now drawing an artificial distinction they themselves have disregarded during the entire course of their relationship with defendants, and have continued to disregard throughout the course of this litigation. *See City of Yonkers v. Otis Elevator Co.*, 607 F.Supp. 1416 (S.D.N.Y.1985) (plaintiff may not urge theory of contract inconsistent with what complaint alleges contract to be in attempt to avoid defense based on statute of frauds). Accordingly, the Court refuses to exclude PepsiCo from the application of the Franklin Agreement's integration clause.

### B. *Vagueness of Contractual Terms*

■ Apart from the parol evidence rule, plaintiffs' alleged oral contract for Texarkana is unenforceable as a matter of law because it is too vague to form the basis of a valid agreement. It is well settled that:

> for a contract to be valid, the agreement between the parties must definite and explicit so their intention may be ascertained to a reasonable degree of certainty. Even if the parties believe they are bound, if the terms of the agreement are so vague and indefinite that there is ... no means by which such terms may be made certain, then there is no enforceable contract.

*Candid Prods., Inc. v. International Skating Union*, 530 F.Supp. 1330, 1333–34 (S.D. N.Y.1982) (footnotes omitted). As another Court explained:

> the parties must agree upon the material and necessary details of the bargain. Here there was no agreement ... as to any of the essential terms of the alleged bargain such as time or manner of performance, price to be paid, or the like. Under such circumstances it is quite apparent that the alleged contract was much too indefinite for plaintiff to reasonably believe he could ever enforce it in an action at law for damages....

*Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 393, 123 A.2d 663, 666 (1956); *see Interocean Shipping Co. v. National Shipping and Trading Corp.*, 462 F.2d 673 (2d Cir.1972). To consummate an enforceable agreement, "the parties must not only believe they have made a contract, they must also have expressed their intent in a manner susceptible of judicial interpretation." *Brookhaven Housing Coalition v. Solomon*, 583 F.2d 584, 593 (2d Cir.1978).

Plaintiffs here assert that the parties forged a binding Franklin/Texarkana

agreement during the March 28, 1985 meeting in Franklin, Pennsylvania. According to Mr. Burkhalter, who was present, "it was a firm commitment by the Deligiannises, and as I understood it, a firm commitment by PepsiCo, that, you know we get what we want and you get what you want." (Burkhalter Tr. 75.) There is no evidence, however, of the price, timing, or any other material terms of the purported oral agreement to "get" Franklin. (*See* C. Deligiannis Tr. 39–45.)

The purported contract is so vague that plaintiffs have offered more than one explanation as to what the claimed promise to get plaintiffs Texarkana actually meant. One alleged scenario is that PepsiCo itself would acquire the Texarkana stock and swap it for the Franklin stock, with plaintiffs compensating PepsiCo for the difference in value (the Texarkana stock being worth more than the Franklin stock). The other scenario is that PepsiCo would assist plaintiffs in finding them the financing that would enable plaintiffs to buy the Texarkana stock directly from Mr. Buchanan. (R. Deligiannis Tr. 4, 6; C. Deligiannis Tr. 39–45; Burkhalter Tr. at 74–77.)

The first scenario was rejected (Mangold Tr. 83–84), and the second scenario, that PepsiCo would somehow assist plaintiffs in obtaining financing for an acquisition of Texarkana (R. Deligiannis Tr. 8–9, 252–54, 505–07, 520–21; C. Deligiannis Tr. 253–58; N. Deligiannis Tr. 138–39; A. Deligiannis Tr. 77), never reached the point at which there was any obligation for PepsiCo to breach, because plaintiffs never contracted with Sam Buchanan to acquire Texarkana. (C. Deligiannis Tr. 307.) Resolving every inference in plaintiffs' favor, the record

established nothing more than PepsiCo's promise, through Jim Mangold, to "take care of [them]." (A. Deligiannis Tr. 58.) Such a promise, however, is insufficient, as a matter of law, to create a legally enforceable contract. *Cf. Trimmer v. Van Bomel,* 107 Misc.2d 201, 434 N.Y.S.2d 82 (N.Y.Sup.Ct.1980) (vague assurance that plaintiff would be "taken care of" amounts to legally unenforceable reassurance where plaintiff presents no evidence of material terms of alleged agreement).

Plaintiffs' negotiation with Santa Fe for the sale of Franklin, after purportedly entering into a binding agreement for the sale of Franklin with PepsiCo, confirms the absence of any legally binding commitment by either party for Franklin. Since plaintiffs admit entertaining Santa Fe's offer for Franklin as late as May 1985, and then turning to PepsiCo and offering it the opportunity to beat Santa Fe's price, it is evident that plaintiffs felt themselves free to negotiate with both Santa Fe and PepsiCo rather than bound by a purported "firm commitment" to PepsiCo. Whatever was said at the March 28 meeting, during which the oral contract to "get" plaintiffs Texarkana is alleged to have been reached, the discussions never reached the point of definiteness where plaintiffs thought themselves bound by a firm agreement.

## C. *The Statute of Frauds*

The agreement plaintiffs allege is a contract for the sale of securities. (R. Deligiannis Tr. 565–66, 577–78; C. Deligiannis Tr. 40–41.) Since no such agreement was in writing (R. Deligiannis Tr. 4; C. Deligiannis Tr. 43), the claim for breach of that contract fails under the statute of frauds.[10]

10. The relevant Pennsylvania statute of frauds provides:

A contract for the sale of securities is not enforceable by way of action or defense unless:

(1) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price;

(2) delivery of the security has been accepted or payment has been made but the contract is enforceable under this paragraph only to the extent of such delivery or payment;

(3) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (1) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt; or

(4) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price.

In its opinion on defendants' 12(b)(6) motion to dismiss, the Court recognized that the statute of frauds "provides that a contract for the sale of securities is not enforceable unless 'there is some writing ... sufficient to indicate that a contract has been made for sale of a stated quantity of securities at a defined or stated price.'" (Opinion at 20.) The Court concluded, however, that one could posit some collateral agreement between plaintiffs and PepsiCo within the four corners of the complaint, which could be separate and apart from any agreement to sell stock. (Opinion at 23–24.) The Court found two possible contracts, other than a contract for the sale of securities, conceivably included within the allegations of the complaint: (1) an agreement that if the Deligiannis group sold Franklin to PepsiCo, PepsiCo would approve the transfer of the Pepsi-Cola trademark license for Texarkana to the Deligiannis group; or (2) an agreement that if the Deligiannis group sold Franklin to PepsiCo, PepsiCo would act as a conduit or agent in arranging that Mr. Buchanan sell his stock in Buchanan Enterprises to the Deligiannis group.

As to the first of these, the evidence is undisputed that if such an agreement had been made, it never was breached. The Deligiannis group never requested that PepsiCo approve the transfer of the license for the Texarkana territory to it, because it never made a deal to acquire Texarkana in the first place. Plaintiffs, moreover, could not have "purchased Buchanan's company without the trademark or franchise rights," as the Court posited, because the testimony was that Buchanan was not prepared to sell on that basis and plaintiffs were not prepared to buy on that basis. (Buchanan Tr. 10–11, 49–50; R. Deligiannis Tr. 64–65, 565.) Furthermore, the evidence is undisputed that PepsiCo informed Sam Buchanan that the Deligiannis group would likely be approved if they requested approval. Sam Buchanan testified that even after he broke off negotiations with Robert Deligiannis and entered into negotiations with Al Burke in November 1985, PepsiCo indicated that it would approve a transfer of Texarkana to the Deligiannis group. (Buchanan Tr. 55.) Accordingly, if the alleged agreement were a promise from PepsiCo to approve the transfer of the Texarkana license to the plaintiffs, that promise never was broken since the predicate agreement to sell Texarkana to plaintiffs never was reached.

As to the second possible contract that would be outside the scope of the statute of frauds—that PepsiCo was to act as a conduit or agent—plaintiffs have failed to introduce any evidence. Plaintiffs have therefore failed to carry their burden of production of evidence on this theory. *Celotex, supra*, 477 U.S. at 323, 106 S.Ct. at 2552. The uncontradicted evidence is that plaintiffs and Buchanan negotiated directly for some five months without any participation by PepsiCo, and that Buchanan had no negotiations whatsoever with PepsiCo concerning the proposed sale of Texarkana. (R. Deligiannis Tr. 542–45, 556–60, 582–89; C. Deligiannis Tr. 149; Buchanan Tr. 11–14, 20–22, 26, 42–44, 55.) The "conduit or agent" hypothesis is simply unsupported by the record. In the final analysis, plaintiffs allege an oral contract for the sale of securities which is barred by the statute of frauds.

### D. *Plaintiffs' Damages Claim*

■ Defendants' final ground for summary judgment is that plaintiffs have failed to establish damages. The Deligiannises advance two theories of damages. First, they claim being financially "crippled," and rendered unable to service their financial obligations as a result of PepsiCo's breach. *See* Complaint ¶¶ 25, 42. Second, they claim damages arising from their not owning Natchez/McComb (which they owned between 1985 and 1989); Jennings/Lake Charles (which they owned between 1985 and 1989) and Texarkana, for a period of thirty years, from 1985 through 2015, plus the projected value of those companies upon a hypothetical sale in 2015.

13 Pa.C.S.A. § 8319 (Purdon 1984) (Pennsylvania U.C.C. § 8–319). The New York provision is virtually identical. *See* N.Y.U.C.C. § 8–319 (McKinney's 1990).

In a claim for loss of future profits "the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of intervening causes." *David v. Glemby Co., Inc.*, 717 F.Supp. 162, 168 (S.D.N.Y. 1989) (quoting *Kenford Co., Inc. v. County of Erie*, 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986)). A plaintiff cannot recover consequential damages from a defendant which could have been avoided by the plaintiff's exercise of reasonable care. *See Henry Shenk Co. v. Erie County*, 319 Pa. 100, 178 A. 662 (1935); *Courtland v. Walston & Co., Inc.*, 340 F.Supp. 1076 (S.D.N.Y.1972).

The record establishes plaintiffs' abject failure to adduce facts supporting either theory of damages. Plaintiffs admit having had extensive opportunities to sell their southern operations for nearly $21 million (at a profit) subsequent to both the Franklin closing and the sale of Texarkana to Al Burke. (R. Deligiannis Tr. 1393; C. Deligiannis Tr. 575–76.) Plaintiffs also admit that such a sale would have provided plaintiffs more than sufficient cash to satisfy their extant financial obligations. (R. Deligiannis Tr. 1393; C. Deligiannis Tr. 575–76.) Instead, plaintiffs refused to make a deal with interested buyers, opting to continue running their business at a loss. Thus, plaintiffs' own uncontradicted testimony establishes that the proximate cause of their financial decline was the rejection of offers which would have permitted sale of their business at a profit, rather than any purported breach of the alleged oral agreement which is the subject of this action. Plaintiffs' unreasonable failure to mitigate, both in fact and as a matter of law, abated any possible damages flowing from the alleged breach. *See Glemby Co.*, 717 F.Supp. at 168; *Courtland*, 340 F.Supp. at 1079–80. In addition, plaintiffs' damages calculation of $95 million is wholly unsubstantiated, based upon faulty premises and nothing more than speculation. *See* Defendants' Memorandum at 78–94.

Plaintiffs' claim that defendants "do not seriously dispute that plaintiffs have been damaged—in fact, defendants admit that plaintiffs were damaged ..." and that defendants' "entire attack is aimed at the issue of the 'amount of damages'" (Pl. Mem. at 25–26) is nothing less than a distortion of the record. The Court rejects it, there being no issue as to plaintiffs' abject failure to establish damages or any other element of their claims.

CONCLUSION

For the reasons set forth above, defendants' motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an order awarding them summary judgment is granted and the complaint is hereby dismissed.

SO ORDERED.